No. 24-4086

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————————

IN RE: EAST PALESTINE TRAIN DERAILMENT

———————————————

MORGAN & MORGAN,

*Interested Party-Appellant*

v.

ZOLL & KRANZ, LLC; BURG SIMPSON ELDREGE HERSH & JARDINE,
P.C; GRANT & EISENHOFFER, P.A.; SIMMONS HANLY CONROY; LIEFF
CABRASER HEIMANN & BERNSTEIN, LLP,

*Interested Parties-Appellees.*

———————————————

On Appeal from the United States District Court
for the Northern District of Ohio
Docket No. 4:23-cv-242
The Honorable Benita Y. Pearson

———————————————

**BRIEF OF APPELLANT MORGAN & MORGAN**

Aaron M. Herzig
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone: (513) 381-2838
aherzig@taftlaw.com

David C. Roper
Taft Stettinius & Hollister LLP
41 South High Street, Suite 1800
Columbus, OH 43215
Phone: (614) 221-2838
droper@taftlaw.com

*Attorneys for Interested Party-*
*Appellant Morgan & Morgan*

Dated: March 3, 2025

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Sixth Circuit Rule 26.1, Appellant Morgan & Morgan makes the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?

Answer: No.

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

Answer: No.


Dated: March 3, 2025                    */s/ Aaron M. Herzig*_____
                                        Aaron M. Herzig

                                        Attorney for Interested Party-Appellant

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT …………………………………… i

TABLE OF CONTENTS …………………………………………………… ii

TABLE OF AUTHORITIES ………………………………………….. iv

STATEMENT REQUESTING ORAL ARGUMENT …………………………... ix

JURISDICTIONAL STATEMENT ………………………………………… 1

STATEMENT OF THE ISSUES ……………………………………… 2

STATEMENT OF THE CASE …………………………………………... 3

 Facts and Procedural History ……………………………………… 6

 The Quick-Pay Provision ……………………………………… 11

 Morgan & Morgan Fights the Quick-Pay Provision …………………... 13

SUMMARY OF THE ARGUMENT ……………………………………… 16

ARGUMENT ……………………………………………………… 19

 Law & Standard of Review …………………………………… 19

 I. The Quick-Pay Provision Conflicts with Rule 23(e)(2)(c)(iii). …… 23

 II. The District Court Lacked the Discretion to Abdicate its Fee Allocation Supervision Duties to Appellees. ……………………… 31

 III. The District Court Abused its Discretion when it Failed to Scrutinize the Appellees' Method for Allocating the Award of Attorneys' Fees. ……………………………………………………… 41

CONCLUSION ……………………………………………………… 47

CERTIFICATE OF COMPLIANCE ……………………………………… 49

CERTIFICATE OF SERVICE …………………………………………….. 50

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ……… 51

# TABLE OF AUTHORITIES

## Cases

*Bowling v. Pfizer*,
102 F.3d 777 (6th Cir. 1996) ........................................................ 33, 34

*Bowling v. Pfizer, Inc.*,
922 F. Supp. 1261 (S.D. Ohio 1996) ....................................................22

*Business Guides, Inc. v. Chromatic Commnc'ns Enters., Inc.*,
498 U.S. 533 (1991) ...............................................................................47

*Cacevic v. City of Hazel Park*,
226 F.3d 483 (6th Cir. 2000) .................................................................19

*Cernelle v. Graminex, LLC*,
539 F. Supp.3d 728 (E.D. Mich. 2021) ..................................................20

*City Commc'ns, Inc. v. City of Detroit*,
888 F.2d 1081 (6th Cir. 1989) ...............................................................45

*Cole v. City of Memphis*,
839 F.3d 530 (6th Cir. 2016) .................................................................20

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC*,
662 F.3d 913 (7th Cir. 2011) .................................................................21

*Fox v. Vice*,
563 U.S. 826 (2011) ...............................................................................39

*Gascho v. Global Fitness Holdings, LLC*,
822 F.3d 269 (6th Cir. 2016) ........................................... 20, 21, 32, 39

*Gen. Motors Pick-Up Litig.*,
55 F.3d 768 (3d Cir. 1995) ............................................................ 21, 22

*GenCorp, Inc. v. Am. Int'l Underwriters*,
178 F.3d 804 (6th Cir. 1999) .................................................................19

iv

*Gottlieb v. Berry*,
43 F.3d 474 (10th Cir. 1994) ..................................................................36

*Hart v. BHH, LLC*,
334 F.R.D. 74 (S.D.N.Y. 2020) ..................................................... passim

*Hensley v. Eckerhart*,
461 U.S. 424 (1983)...............................................................................39

*Imwalle v. Reliance Med. Prods., Inc.*,
515 F.3d 531 (6th Cir. 2008) ..................................................................32

*In re Agent Orange Prods. Liab. Litig.*,
818 F.2d 216 (2d Cir. 1987)............................................................ 21, 32

*In re Auto. Refinishing Paint Antitrust Litig.*,
No. MDL NO 1426, 2008 WL 63269 (E.D. Pa. Jan. 3, 2008) .................. 31, 32, 40

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ..................................................................41

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
424 F. Supp.3d 456 (E.D. La. 2020)........................................................31

*In re Diet Drugs*,
401 F.3d 143 (3d Cir. 2005)...................................................................40

*In re Dry Max Pampers Litig.*,
724 F.3d 713 (6th Cir. 2013) ....................................................... passim

*In re Flint Water Cases*,
583 F. Supp.3d 911 (E.D. Mich. 2022)....................................................43

*In re High Sulfur Content Gasoline Prods. Liab. Litig.*,
517 F.3d 220 (5th Cir. 2008) ....................................................... passim

*In re Syngenta AG MIR 162 Corn Litig.*,
61 F.4th 1126 (10th Cir. 2023) ...............................................................34

v

*In re TikTok, Inc. Consumer Privacy Litig.*,
617 F. Supp.3d 904 (N.D. Ill. 2022) ........................................................35

*In re Vitamins Antitrust Litig.*,
398 F. Supp.2d 209 (D.D.C. 2005) ..........................................................22

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004)......................................................................31

*In re Wawa, Inc. Data Sec. Litig.*,
85 F.4th 712 (3d Cir. 2023) ............................................................. 32, 33

*In re Wells Fargo & Co. Shareholder Derivative Litig.*,
445 F. Supp.3d 508 (N.D. Cal. 2020) .......................................................39

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
722 F.3d 838 (6th Cir. 2013) ....................................................................20

*In re Whirlpool Corp. Front-loading Washer Prods. Liab. Litig.*,
No. 1:08-WP-65000, 2016 WL 5338012 (N.D. Ohio Sept. 23, 2016)....................27

*Intera Corp. v. Henderson*,
428 F.3d 605 (6th Cir. 2005) ........................................................... 19, 20

*JPMorgan Chase Bank, N.A. v. Winget*,
920 F.3d 1103 (6th Cir. 2019) ...................................................................1

*Kim v. Allison*,
8 F.4th 1170 (9th Cir. 2021) .....................................................................22

*Lessard v. City of Allen Park*,
422 F. Supp.2d 787 (E.D. Mich. 2006).....................................................26

*Lewis v. Sole Law, PLLC*,
652 F. Supp.3d 886 (E.D. Mich. 2023)............................................. 19, 46

*Little Hocking Water Ass'n, Inc. v. E.I. Du Pont de Nemours & Co.*,
No. 2:09-cv-1081, 2013 WL 1196606 (S.D. Ohio Mar. 25, 2013) ........................46

*McCormick v. W. Ky. Navigation Inc.*,
993 F.2d 568 (6th Cir. 1993) .................................................................26

*Pavelic & LeFlore v. Marvel Ent. Grp.*,
493 U.S. 120 (1989).............................................................................47

*Pelzer v. Vassalle*,
655 F. App'x 352 (6th Cir. 2016) ................................................ passim

*Rawlings v. Prudential-Bache Props., Inc.*,
9 F.3d 513 (6th Cir. 1993) .......................................................... passim

*Sakiko Fujiwara v. Sushi Yasuda Ltd.*,
58 F. Supp.3d 424 (S.D.N.Y. 2014) ......................................................30

*Smellie v. Park Chem. Co.*,
710 F.2d 271 (6th Cir. 1983) .................................................................20

*Strong v. BellSouth Telecomm., Inc.*,
137 F.3d 844 (5th Cir. 2008) ........................................................ 22, 39

*United States v. Ivy*,
93 F.4th 937 (6th Cir. 2024) .................................................................26

*United States v. Reyes*,
307 F.3d 451 (6th Cir. 2002) ........................................................ 19, 20

*Vazquez v. A+ Staffing LLC*,
--- F. Supp.3d ---, 2024 WL 3966246 (E.D.N.Y. Aug. 27, 2024) ..........................42

*Victor v. Argent Classic Convertible Arbitrage Fund L.P.*,
623 F.3d 82 (2d Cir. 2010).......................................................... 21, 34

## Rules

FED. R. CIV. P. 23 ............................................................. passim

FED. R. CIV. P. 23, 2003 Advisory Committee Notes....................................... 33, 35

Fᴇᴅ. R. Cɪᴠ. P. 37 ..................................................................................38

Fᴇᴅ. R. Cɪᴠ. P. 59 ............................................................................ 19, 20

Fᴇᴅ. R. Cɪᴠ. P. 60 ............................................................................ 19, 20

## Other Authorities

5 Nᴇᴡʙᴇʀɢ & Rᴜʙᴇɴsᴛᴇɪɴ ᴏɴ Cʟᴀss Aᴄᴛɪᴏɴs (6th ed. 2024) ...................... passim

Brian T. Fitzpatrick, *The End of Objector Blackmail?*,
62 Vᴀɴᴅ. L. Rᴇᴠ. 1623 (2009) ...................................................................27

Manual for Complex Litigation (4th ed. 2004) ......................................................31

www.eastpalestinetrainsettlement.com/faq ..............................................................8

## STATEMENT REQUESTING ORAL ARGUMENT

The decision in this case will come with wide-ranging implications for the oversight a district court must exercise in approving class action settlements and attorneys' fee awards. The record is voluminous and each factual detail is important. Oral argument would aid the Court, given the complexity of the issues of law and fact in this appeal.

## JURISDICTONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332(d) because the proposed class action had more than 100 members, the parties were minimally diverse, and the amount in controversy exceeded $5,000,000 after aggregating the claims of individual members of the proposed class. (*See* First Am. Class Action Compl., R. 138, PageID 1785.)

This is an appeal from the district court's Order denying T. Michael Morgan and Morgan & Morgan's Motion to Clarify, Alter, Amend or Reconsider, and to Enjoin Distribution of Attorneys' Fees Prior to Resolution of Appeals. This Court has jurisdiction under 28 U.S.C. § 1291, as the district court's Order represented a final decision on attorneys' fees arising from claims that were also subject to a final judgment. *See JPMorgan Chase Bank, N.A. v. Winget*, 920 F.3d 1103, 1106 (6th Cir. 2019).

**STATEMENT OF THE ISSUES**

1.  Whether, in light of its duty to prevent plaintiffs' attorneys from receiving preferential treatment over their clients, the district court erred by authorizing a "quick-pay" settlement provision that allowed plaintiffs' attorneys to pay themselves many months before their clients receive their settlement awards, and where objections to the settlement could further delay or reduce the clients' awards.

2.  Whether the district court abused its discretion by abdicating its authority to oversee the distribution of attorneys' fees to a few of the interested attorneys through a proposed order drafted by those attorneys.

3.  Whether the district court abused its discretion by accepting the Appellees' representations that the hours of every law firm were treated the same in their unsupervised allocation of the attorneys' fees award.

## STATEMENT OF THE CASE

The Parties to this appeal are the plaintiffs' firms that facilitated a class action settlement in the aftermath of a train derailment in East Palestine, Ohio. Appellant T. Michael Morgan and Morgan & Morgan ("Appellant" or "Morgan & Morgan") played a critical role throughout the litigation as the co-lead counsel, representing plaintiffs who filed individual lawsuits, which were consolidated with other cases arising from the train derailment. The Appellees served as co-lead class counsel alongside Morgan & Morgan, as they filed class action complaints on behalf of their clients. Even before they were appointed as co-leads, Morgan & Morgan worked together with the Appellees to achieve just compensation for the residents and businesses of East Palestine. That is, until it came time to administer the settlement and allocate attorneys' fees.

First, the Appellees had Morgan & Morgan removed from its co-lead counsel role. Then, without consulting Morgan & Morgan, the Appellees came up with a quick-pay term that would pay plaintiffs' counsel right away—even if a large number of their clients would have to wait years before receiving any compensation. Worse yet, the Appellees made themselves the sole arbiters for attorney compensation. They did so with their reply brief, modifying the proposed order they filed with their motion to give themselves unsupervised control over fee allocations. They did not share their reply brief with Morgan & Morgan, but they included Mr.

Morgan's signature on it as if he agreed with it. The district court adopted that order, improperly abdicating its responsibility to oversee the allocation of attorneys' fees.

This case asks the Court to resolve important questions regarding whether and, if so, how plaintiffs' counsel in a class action can pay themselves from settlement funds before many of their clients receive compensation for their injuries. The district court approved a quick-pay provision, which allowed plaintiffs' counsel to receive $162 million when the district court gave final approval to the settlement agreement, while thousands of their clients will not receive their damages until all appeals are exhausted.

While some courts have approved quick-pay provisions on the promise that they would limit "frivolous" objectors to class action settlements, that promise has not been fulfilled. And even if quick-pay provisions worked, they are not the right solution. The Federal Rules, enshrining basic due process rights, permit class members to object to settlements. That process may be onerous to courts, and it may delay finalization of settlements, but it is no reason to allow lawyers to avoid that delay while their clients cannot. If there is a corrective, it should come through amendments to the Rules or through congressional action. It should not be left in the hands of the lawyers who benefit directly from their own choices.

On a similar note, this case implicates the extent of a district court's Rule 23(h) oversight obligations when it comes to attorneys' fee allocations derived from

a common fund. The district court surrendered its discretion over 27% of the settlement fund to the Appellees. But if a small group of privileged lawyers is allowed to control the fees in every class action settlement, courts will lose the ability to maintain the correlation between attorney compensation and performance. As soon as that happens, the incentives for plaintiffs' attorneys in class action cases will shift away from positive motivators like client service and good casework and toward negative ones such as self-dealing and the politics of litigation. This Court has wisely recognized that creating the right incentives is critical to protecting the fairness of class action settlements. The only way to reinforce that message is to show that good work pays and everything else is secondary. Yet the district court's orders allow the Appellees from lavishing themselves and distributing the rest of the attorneys' fees however they see fit. That sort of "anything goes" environment is fundamentally at odds with the incentives-based evaluation this Court has required in past Rule 23(h) cases.

Even with the right incentives in place, there still has to be a way to verify that attorneys' fees were properly distributed. That didn't happen here. The district court just took the Appellees' word instead of checking their work. At the very least, the record should vindicate the Appellees' methodology for distributing the attorneys' fees and provide this Court with confidence that the lawyers fairly administered their

share of the settlement funds. There is nothing in the record to provide this Court with any such confidence.

## Facts and Procedural History

The underlying class action lawsuit arose from the events of February 3, 2023, when Norfolk Southern Train 32N derailed in East Palestine, Ohio. (First Am. Class Action Compl., R. 138, PageID 1784.) The derailment caused a chemical explosion that released at least a dozen toxins into the environment around the derailment site. (*Id.*, PageID 1807–1814.) The Parties to this appeal filed lawsuits on behalf of the thousands of people and businesses who were affected by the fallout. (*Id.*, PageID 1814–18.) The district court consolidated the individually filed cases, ordered briefing on a proposed class counsel organizational structure, and appointed both Appellants and Appellees to this appeal to lead the plaintiffs' case together. (*See* R. 28, 30.)

Morgan & Morgan represented a group of individuals and entities that originally filed standalone cases without class allegations, but did not oppose or object to class resolution. (*See* Order Appointing Interim Class Counsel, R. 28, PageID 563 n. 3.) After the court-ordered consolidation, Morgan & Morgan served as a Co-Lead to represent the interests of individual claimants. (*Id.*, PageID 562–63.) The district court appointed Appellees as Interim Class Counsel. (*Id.*, PageID 562.) Together, the Co-Leads—Morgan & Morgan and Appellees—were authorized

to make decisions on legal arguments, assign work to attorneys and monitor it, retain experts, and engage in settlement discussions. (R. 28, PageID 559–71; R. 33, PageID 782–86.) The district court also approved time and expense billing guidelines that gave Morgan & Morgan and the Appellee firms an equal role in administering the attorneys' fees that accrued from work for the common benefit of all plaintiffs. (R. 33, PageID 782.) Read together, the purpose of these orders was to provide the case leadership team, including Morgan & Morgan, the know-how to administer settlement funds "at the end of the litigation should there be fee and expense distributions." (*Id.*, PageID 789.) Throughout the subsequent litigation, Morgan & Morgan acted in its court-appointed co-lead role and developed an unsurpassed knowledge of each plaintiffs' firms' contributions to the case.

After about a year of litigation and negotiation, the plaintiffs agreed to settle their claims in the underlying case on a classwide basis. (Mot. for Prelim. Approval of Settlement, R. 452.) Appellant and Appellees, on behalf of their clients, executed a settlement agreement and sought district court approval on April 26, 2024. (*Id.*; Settlement Agreement, R. 452-2, PageID 6038.)

At the time, the district court hadn't ruled on class certification, so the agreement was predicated on the district court's approval of a proposed Settlement Class. (Order on Motion for Final Approval of Settlement, R. 557, PageID 14581.) The settlement motion asked the district court to recognize the Appellees as Co-Lead

Class Counsel because their cases were filed as class actions. (Proposed Settlement Approval Order, R. 452-7, PageID 6141.) At the same time, the settlement motion highlighted Morgan & Morgan's key role in prosecuting the case on behalf of the entire Settlement Class. (Mot. for Prelim. Approval of Settlement, R. 452-1, PageID 5969.) Appellees' attorneys introduced Mr. Morgan as Co-Lead Counsel at the fairness hearing and cited his work as a critical part of the settlement process. (Fairness Hearing Tr., R. 553, PageID 14429, 14483.) To this day, the class settlement website tells claimants that Mr. Morgan is Co-Lead Counsel.[1] Nothing about the settlement filings or the fairness hearing made clear that Mr. Morgan would relinquish his oversight role over attorneys' fee administration simply because the entire case was settled as a class action.

The settlement agreement didn't satisfy everyone—several dozen members of the Settlement Class objected. (Objectors Briefs, R. 485, R. 486, R. 529.) The

_____

[1] *See* www.eastpalestinetrainsettlement.com/faq (visited Mar. 3, 2025) (Q: "Who are the Lawyers Representing the Settlement Class?"

A: "The Court appointed the following lawyers to represent you and the other Settlement Class Members: Seth A. Katz of Burg Simpson Eldredge Hersh & Jardine, P.C.; M. Elizabeth Graham of Grant & Eisenhofer P.A.; and Jayne Conroy of Simmons Hanly Conroy. The Court also appointed T. Michael Morgan of Morgan & Morgan, P.A. as a Co-Lead Counsel.

"These firms are called Co-Lead and Class Counsel. Class Counsel was selected by the Court due to their proven experience and extensive track record. You will not be charged individually for their services; if approved by the Court, Co-Lead and Class Counsel will be compensated from the Settlement. A copy of Co-Lead and Class Counsel's Motion for Attorneys' Fees and Expenses will be available by September 6, 2024."

objectors advanced four purported problems with the $600 million settlement agreement. First, they worried that the settlement might not provide an adequate remedy for their latent injuries. (R. 553, PageID 14460–64.) Second, the objectors complained that they didn't have enough time to digest the settlement agreement and its implications. (*Id.*, PageID 14452, 14458–59.) Third, they argued some members of the settlement class would have to pay double attorneys' fees to achieve full redress: once out of the 27% allocation from the class settlement fund *and* an additional contingency fee to the lawyer(s) who protected their individual interests. (*Id.*, PageID 14450–51.) Finally, one objector stated that "[t]he proposed terms of the attorney's fees are too high" and complained about the timing of attorney compensation. (Sheely Objections, R. 485, PageID 7312, 7314.) The district court evaluated these objections as part of the settlement fairness hearing on September 25, 2024. (R. 553.)

The district court overruled the objections from the dissenting members of the Settlement Class at the end of the fairness hearing. (*Id.*, PageID 14537; *see* R. 558, R. 570 (listing the notices of appeal for objectors Sheely, Freeze, Troyan, Lynch, and Tunno); Case No. 24-03852 (Sheely appeal), Case No. 24-03380 (Freeze, Troyan, Lynch, and Tunno appeal).) Just two days after the fairness hearing, on September 27, 2024, the court issued written orders approving the settlement, including its plan for distribution of the settlement funds and the Appellees' motion

for attorneys' fees. (R. 555, R. 556, R. 557; *see also* R. 557, PageID 14580 (approving the Settlement Agreement listed on the docket as R. 452-2).) The orders largely mirrored the proposed orders drafted by Appellees. (R. 553, PageID 4537; *compare* R. 518-11, R. 519-4, R. 520-5, R. 538-5 (proposed orders on final settlement approval, plan of distribution, and attorneys' fees, expenses and service awards) *with* R. 555, R. 556, R. 557 (orders resolving those issues).)

Without informing Morgan & Morgan, Appellees submitted a proposed order with the reply brief on attorneys' fees that was materially different from the one they had submitted with the initial motion. (R. 664-1, PageID 46333–34; *compare* R. 520-5 (original proposed order) *with* R. 538-5 (reply proposed order).) The reply proposed order added a new provision authorizing the Appellees "to distribute the fees in manner that, in the judgment of the [Appellees], fairly compensates each attorney and/or firm for their contribution to the prosecution of Plaintiffs' class claims." (R. 538-5, PageID 12399–12400.) The Appellees submitted this revised proposed order without telling anyone at Morgan & Morgan that they added the above-quoted delegation language. (Mot. to Enjoin Attorneys' Fee Award, R. 664-1, PageID 46336.) And Appellees signed Mr. Morgan's name to the reply brief without informing him they intended to take total control over the fee allocation process and exclude him from it. (*Id.*, PageID 46333.) In fact, the Appellees filed the reply brief without even sharing it with Morgan & Morgan—even though Mr.

Morgan's name appeared on the signature block. (*Id.*) The district court used the proposed order submitted with the reply brief as the template for its order on attorneys' fees, expenses, and service awards. (R. 556, PageID 14578 (adopting the language delegating fee distribution authority to Appellees).) In effect, the Appellees prevented Morgan & Morgan from performing any oversight over the fee allocation, all without apprising Mr. Morgan or the district court of what they were doing.

## The Quick-Pay Provision

The Settlement Agreement included a quick-pay provision. Under Section XIV(D) of the Settlement Agreement, Class Counsel received its fees within 14 days after the district court ordered Final Approval of the settlement. (R. 452-2, PageID 6028–29 ("The Fee Award awarded to Class Counsel will be paid from the Settlement Fund into the Escrow Account . . . within fourteen (14) days after the grant of Final Approval."); *id.*, PageID 6010 at § 2(X) ("'Final Approval' means the [District] Court's order finally approving the Settlement.").)

While Class Counsel got paid quickly, many of their clients have not received their damages. And those clients have no certainty as to when their damages will come. The Settlement Administrator cannot distribute a dime from the "Settlement Fund" to the unlucky members of the settlement class until after the "Effective Date." (*Id.*, PageID 6027 at § 14(E)). The "Effective Date" is an unknown date after

all appeals are exhausted. (*Id.*, PageID 6010 at § 2(S).)[2] Moreover, while Class Counsel's fees were wired to them as soon as they were available (*id.*, PageID 6028 at § 14(D)), the class members cannot get anything without going through the Settlement Administrator. (*Id.*, PageID 6008, 6015.)

The objector appeals are still preventing many class members from receiving any settlement funds—at least until this Court resolves them, triggering the Effective Date under the Settlement Agreement. (R. 664-1, PageID 46336.) Yet the Appellees used the quick-pay provision to take the attorneys' fees and allocate them among their co-counsel using an unexplained methodology. (*Id.*, PageID 46335–36.) So, as a group, the plaintiffs' lawyers are $162 million richer today, while many of their clients remain no better off than they were the day after the train derailment. Moreover, all the victims of the train derailment have to go through a settlement administrator to get their money. (R. 452-1, PageID 5983; R. 555, PageID 14546; R. 557, PageID 14582.) In contrast, the Appellees got to divide the attorneys' fees

---

[2] "'Effective Date' means one business day following the later of: (1) the date upon which the time expires for filing or noticing any appeal of the Final Judgment; (2) if there is an appeal or appeals, the date of completion, in a manner that finally affirms and leaves in place the Final Judgment without any material modification, of all proceedings arising out of the appeal(s) (including but not limited to the expiration of all deadlines for motions for reconsideration or petitions for review and/or certiorari, all proceedings ordered on remand, and all proceedings arising out of any subsequent appeal(s) following decisions on remand); or (3) the date of final dismissal of any appeal or the final dismissal of any proceeding on certiorari with respect to the Final Judgment." (R. 452-2, PageID 6010.)

with no supervision. (R. 556, PageID 14578.) Again, the district court granted the Appellees the "authority to distribute the fees in a manner that, in [their judgment], fairly compensates each attorney and/or firm." (*Id.*) In effect, leaving the fee allocation to the Appellees gave them the authority to artificially discount the value of other lawyers' work or even distribute the fee award without any relationship between performance and compensation. (R. 664-1, PageID 46335–36.)

### Morgan & Morgan Fights the Quick-Pay Provision

The reason for the Appellees' covert efforts to exclude Morgan & Morgan from the fee allocation process became clear only after the settlement funds arrived. Morgan & Morgan was not informed until October 7, 2024 that Appellees planned to distribute the attorneys' fees right away—all without including Mr. Morgan in his role as a co-lead. (*Id*, PageID 46335.) Mr. Morgan was not consulted, which he should have been in his capacity as the representative for individual plaintiffs during settlement discussions. (*Id.*, PageID 46333.)

Morgan & Morgan objected to this covert "I get paid, you wait" scheme—especially in such a complicated case with an enormous pot of settlement money and dozens of law firms that contributed in various ways. (*Id.*, PageID 46332–65.) On October 25, 2024, Morgan & Morgan moved to enjoin the Appellees from distributing the attorneys' fees and to provide safeguards in the fee allocation process. (*Id.*, PageID 46344.) On November 1, 2024, the district court held a

telephonic status conference on Morgan & Morgan's motion. (*See* Order on Mot. to Lift Restrictions on Use of Tr., R. 729, PageID 51830.) The status conference included Mr. Morgan and the Appellees' representatives; the defendants were not involved and the transcript remains sealed from the public docket. (*Id.*) The district court was hostile to Morgan & Morgan's arguments from the outset, recharacterizing its fairness concerns as personal accusations against the court and admonishing Mr. Morgan from the very first word he spoke. (Nov. 1, 2024 Hearing Tr. at 5–6.)

The district court denied Morgan & Morgan's motion in a written order on November 18, 2024. (Order Denying Morgan & Morgan's Fee Mot., R. 689, PageID 51079–89.) That order faulted Mr. Morgan for a perceived lack of awareness that "'quick pay' is a term in the Settlement Agreement that he signed." (*Id.*, PageID 51086.) But the problems with the quick-pay provision didn't become relevant until after the settlement was approved and the objectors noticed their appeals, thereby precluding many of the plaintiffs from recovering their share of the settlement proceeds. Relatedly, the Appellees didn't reveal their disregard for Morgan & Morgan's fee oversight responsibilities until they decided to use the quick-pay provision for their own benefit. Morgan & Morgan timely noted its objections to the Appellees' fee distribution plan as soon as it became clear that their allocation decisions could harm the settlement class and their co-counsel. Moreover, the district court credulously accepted that Appellees "utilized a model and methodology in

14

allocating fees based on objective information and the Court's Order." (*Id.*, PageID 51082.) Yet the court never tested the Appellees' claimed methodology or made them prove themselves good stewards of the fee award. These foundational flaws in the district court's reasoning culminated in the errors discussed herein. This timely appeal followed.

## SUMMARY OF THE ARGUMENT

Civil Procedure Rule 23 requires federal courts to "carefully scrutinize" lead counsel's fiduciary performance to ensure that those lawyers didn't afford themselves "preferential treatment" in a class action settlement. *In re Dry Max Pampers Litig.*, 724 F.3d 713, 718 (6th Cir. 2013). That didn't happen here. Instead, the district court adopted the Appellees' post-settlement proposed orders with no substantive changes—and allowed the Appellees to get away with using Mr. Morgan's signature block without his permission. The district court abused its discretion when it approved a quick-pay mechanism that allowed Appellees to grant themselves preferential treatment to the detriment of their clients. The plaintiffs' lawyers have gotten paid, but too many of the plaintiffs are still waiting to get relief for their injuries.

Many residents of East Palestine are waiting to find out if they will receive their damages while their attorneys get to leave town with $162 million. Settlement payments may be coming one day, but those who are struggling through the fallout from the train derailment should have confidence that they will get 100% of the money that belongs in the community.

The district court didn't oversee the settlement thoroughly enough to provide that confidence. The Appellees drafted self-serving proposed orders that gave them unfettered authority over the attorneys' fees—and the district court adopted them. In

effect, the district court gave the Appellees license to allocate 27% of the common fund in a way that has nothing to do with attorney performance. This abdication of authority over the fee distribution threatens the integrity of the settlement. The Appellees have fiduciary obligations to each member of the settlement class and their co-counsel. As a result, every dollar of attorney compensation that is untethered to performance is money that someone else deserved. The discretion afforded to a district court does not allow it to place $162 million of the common fund outside of the court's fiduciary oversight.

Morgan & Morgan couldn't get the answers when Mr. Morgan raised these issues below. Though Morgan & Morgan served as a Co-Lead Counsel throughout the litigation, the district court never held the Appellees accountable for using Mr. Morgan's signature without his permission to gain settlement approval or to their purported fee allocation method. Nor did the court recognize that Morgan & Morgan's role as Co-Lead Counsel gave Mr. Morgan knowledge that was necessary to inform its fee discretion. At the telephonic status conference on the fee dispute, it never required the Appellees to provide evidence to support their statements about their allocation method. Further, Mr. Morgan's knowledge of the case would have been an indispensable part of that evaluation. And now, this Court cannot double-check the multipliers or verify that the Appellees were good stewards of the

attorneys' fees. It never sought verifying information from Appellees, so it could not have overseen the allocations in the manner required by Rule 23.

The district court's abdication of its authority over the attorneys' fees was an abuse of discretion. So too was excusing the Appellees' illicit use of Mr. Morgan's signature without ever giving him answers about the fee allocation method they still have not explained. The only way to safeguard the common fund and ensure public confidence in the fairness of the settlement is to require court oversight over a new and transparent allocation of the attorneys' fees after unwinding the quick-pay provision.

## ARGUMENT

The district court erred by permitting the lawyers to receive their fees while their clients are forced to wait until all appeals are exhausted. No class counsel should enjoy millions of dollars—including some that might not belong to them—while a large group of their injured clients are left wondering whether they'll ever receive compensation. Nor should a small group of lawyers have the unconstrained power to decide the fortunes of dozens of other law firms who poured their time, energy, and resources into working up the class settlement.

## Law & Standard of Review

Morgan & Morgan filed its motion challenging the fee allocation under Rule 59(e) and Rule 60(b). Relevant here, a district court should grant a Rule 59(e) motion if a prior disposition is based on a clear error of law or there is a need to prevent manifest injustice. *Lewis v. Sole Law, PLLC*, 652 F. Supp.3d 886, 890 (E.D. Mich. 2023) (citing *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005); *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999)). Rule 60(b) relief is proper when "an attorney has acted without authority" and "when the judge has made a substantive mistake of law or fact in the final judgment or order." *Id.* (quoting *United States v. Reyes*, 307 F.3d 451, 455 (6th Cir. 2002); *Cacevic v. City of Hazel Park*, 226 F.3d 483, 490 (6th Cir. 2000)). Further, a district court may amend an order "for any other reason that justifies relief." *Id.* at 890–91 (quoting

*Cernelle v. Graminex, LLC*, 539 F. Supp.3d 728, 734 (E.D. Mich. 2021). Abuse of discretion review applies to a district court's Rule 59(e) and Rule 60(b) decisions. *Intera Corp.*, 428 F.3d at 619; *Reyes*, 307 F.3d at 455.

Likewise, district courts' Rule 23 decisions, including their oversight of attorneys' fee awards, are reviewed for abuse of discretion. *See Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 279 (6th Cir. 2016). An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016) (quoting *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013)).

Class action settlements are all different, so each individual award of attorneys' fees must "be reasonable under the circumstances." *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993) (citing *Smellie v. Park Chem. Co.*, 710 F.2d 271, 275 (6th Cir. 1983)). Part of that reasonableness review includes the duty "to ensure that attorneys' fees are . . . divided up fairly among plaintiffs' counsel." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 (5th Cir. 2008). That's an important concern because "lead counsel has an incentive to undercompensate non-lead counsel, as such

compensation typically decreases lead counsel's own recovery." *Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 89 (2d Cir. 2010).

When it comes to scrutinizing attorneys' fees, a district court cannot rely on the adversarial process to protect the interests of class members. *In re Dry Max Pampers Litig.*, 724 F.3d 713, 717–18 (6th Cir. 2013). That's because settling defendants only care about their total liability—"a settlement's allocation between the class payment and the attorneys' fees is of little or no interest to the defense." *Id.* at 717 (quoting *Gen. Motors Pick-Up Litig.*, 55 F.3d 768, 820 (3d Cir. 1995)). And the class counsel have an incentive to pursue "generous compensation" for themselves—sometimes at the expense of the class members and their co-counsel. *Id.* at 718 (quoting *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011)).

With the divergence of interests among class counsel, their co-counsel, and their clients in mind, a district court must "carefully scrutinize" whether the lawyers leading the case have met their fiduciary obligations to the class members they represent. *Id.* at 718. At the same time, "a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved." *Gascho*, 822 F.3d at 279 (quoting *Rawlings*, 9 F.3d at 516); *see also In re Agent Orange Prods. Liab. Litig.*, 818 F.2d 216, 221–22 (2d Cir. 1987) (disallowing a private fee sharing arrangement that disrupted the court's Rule 23 oversight); 5

NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 15:57 (6th ed. 2024) ("[T]he common fund doctrine holds that an attorney responsible for recovering a common fund is generally entitled to a fee from that fund."). These responsibilities are "only heightened where, as here, the common fund results from a pre-certification settlement." *Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261, 1278 (S.D. Ohio 1996) (citing *Gen. Motors Pick-Up Litig.*, 55 F.3d at 821); *see also Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021) ("[S]ettlements that occur before class certification are subject to a 'high procedural standard.'") (quotation omitted).

In exercising its fiduciary oversight authority over a common fund, "the district court must not cursorily approve the attorneys' fee provision of a class settlement or delegate that duty to the parties." *In re Sulfur Content Gasoline Prods.*, 517 F.3d at 228 (quoting *Strong v. BellSouth Telecomm., Inc.*, 137 F.3d 844, 850 (5th Cir. 2008)). At bottom, the settlement class, their lawyers, and the public at-large are entitled to the information necessary to evaluate how the fee allocation was performed. *Id.* at 232. "After all, '[a]llocation means proportion; how does the share [one] counsel is taking compare to the shares others are getting?'" *Id.* (quoting *In re Vitamins Antitrust Litig.*, 398 F. Supp.2d 209, 234 (D.D.C. 2005)).

The district court failed to perform the fiduciary oversight responsibilities required under Rule 23. Specifically, it erred by neglecting to ensure that money that might belong to the residents of East Palestine is fairly allocated and properly

administered during the objectors' appeals. Likewise, the district court overlooked the common fund doctrine, which requires that all lawyers who contributed to settlement receive fair compensation.

## I. The Quick-Pay Provision Conflicts With Rule 23(e)(2)(c)(iii).

Quick-pay provisions allow class counsel to collect their fees from the settlement fund right away, subject to repayment if a court later rejects the settlement agreement. *See Pelzer v. Vassalle*, 655 F. App'x 352, 365 (6th Cir. 2016). Here, the quick-pay provision was proposed as part of the Motion for Preliminary Approval of Settlement. (R. 452-2, PageID 6028–29.) The repayment clause kicks in if the settlement agreement or fee award is overturned on appeal. (*Id.*) This arrangement gives the attorneys preferred access to the settlement fund and could jeopardize their clients' ability to recover money that should remain in East Palestine.

A district court abuses its discretion under Rule 23(e)(2)(C)(iii) when it approves an unreasonable quick-pay provision. *See Pelzer*, 655 F. App'x at 365. Thus, a quick-pay provision "that gives preferential treatment to class counsel" or allows class counsel to "disregard their fiduciary responsibilities" to their clients cannot stand. *See Dry Max Pampers*, 724 F.3d at 718 (quotation omitted).

While the settlement and cumulative fee award are fair, it is fundamentally unfair for class counsel to take their fee award allocations while many of their clients must wait until the objectors' appeals are resolved.

Some federal courts have retreated from the assumption that "there is no harm to the class by paying attorneys first" so long as "the size of the settlement fund available to the class will be the same." *Hart v. BHH, LLC*, 334 F.R.D. 74, 78 (S.D.N.Y. 2020) (discussing a quote from *Pelzer*, 655 F. App'x at 365). In other words, class members have an interest in getting relief before their attorneys take a slice of their recovery. *Id.* at 77. "Indeed, the entire purpose of the lawsuit is to compensate the class" of people harmed by the train derailment—not to leave them wondering why their lawyers get paid while they're left waiting with unanswered questions. *Id.* The people of East Palestine deserve relief and delaying it any more than necessary worsens their injuries. This Court should preserve the legitimacy of, and confidence in, the class action process by bringing the attorneys back in line with the well-known "I don't get paid unless you get paid" principle.

Consider what might happen if dozens of law firms must come up with an interest-bearing $162 million within two weeks. Law firm revenues don't sit in a bank account. They go toward overhead costs, employee salaries, partner distributions, and tax obligations just to name a few. Plus, plaintiffs' firms must invest most of their free cash into their cases that haven't yielded a contingency fee yet—and some of those don't work out. Put differently, it's impossible to properly develop class action and mass tort cases without enormous up-front investments. Indeed, the Appellees spent over $5.3 million in this case by the time the quick-pay

settlement money arrived. (R. 556, PageID 14575–77.) With those kinds of unrealized case investments in mind, some of the plaintiffs' firms will lack the liquidity to repay their share of the fee award should it become subject to a claw back. If this Court agrees with Objector Sheely and decides that "the attorney's fees are too high," the repayment provision may not be enough, and the process of collection could spawn further controversy and litigation. (*See* Sheely Objections, R. 485, PageID 7314.) Quite simply, the quick-pay provision threatens too much common fund money and is therefore unreasonable.

More to that point, the district court erred by finding that the harm caused by the Appellees' quick-pay scheme amounts to "mere speculation" on the presence of irreparable harm. (R. 689, PageID 51087.) As the *Hart* court noted, quick-pay provisions do, in fact, harm the settlement class. 334 F.R.D. at 78 ("This Court disagrees that there is no harm to the class by paying attorneys first."). At the very least, the attorneys benefit from the time value of money, while their uncompensated clients do not. Further, the authorization of an unreasoned fee allocation plan destroys the legitimacy of the class action process in the eyes of the public. *See In re High Sulfur Content Gasoline*, 517 F.3d at 228. Altogether, once the public sees that the attorneys are paid and the settlement class has nothing to show for the class action, the harm caused by the court's lack of oversight cannot be undone.

The district court erred by releasing $162 million to the Appellees with a single stroke of a pen. At the very least, it should have appointed a special master charged with overseeing an orderly and responsible allocation of attorneys' fees. *See McCormick v. W. Ky. Navigation Inc.*, 993 F.2d 568, 569 (6th Cir. 1993). Such a process would have mitigated the risk presented by the Appellees' unsupervised distribution of the fee award. *See Lessard v. City of Allen Park*, 422 F. Supp.2d 787, 788–79 (E.D. Mich. 2006) (recommending the concurrent distribution of the remaining attorneys' fees and settlement funds). But now, 27% of the settlement fund is outside the district court's direct control, perhaps irreversibly so.

To be sure, federal courts, including this one, have approved quick-pay provisions in prior cases. *See, e.g.*, *Pelzer*, 655 F. App'x at 365 ("We conclude that the district court did not abuse its discretion in finding the quick-pay provision here to be reasonable."). But the those decisions have no binding effect on this case. First, every class action settlement is different, so the results of a prior Rule 23(h) review cannot dictate the outcome in a subsequent case. *See Rawlings*, 9 F.3d at 516. Second, the failure of quick-pay has come into focus since those provisions first came before this Court. Accordingly, no litigant has ever argued that quick-pay provisions should be banned or constrained because they do not work. *See United States v. Ivy*, 93 F.4th 937, 947 (6th Cir. 2024).

Quick-pay provisions haven't delivered on their promise of deterring frivolous class settlement objections. *Hart*, 334 F.R.D. at 77; *but see Pelzer*, 655 F. App'x at 365; *In re Whirlpool Corp. Front-loading Washer Prods. Liab. Litig.*, No. 1:08-WP-65000, 2016 WL 5338012, at *21 (N.D. Ohio Sept. 23, 2016) (citing Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623, 1625 (2009) for the proposition that "[t]he essential purpose of a quick-pay clause is to disincentivize lawyers who are "professional objectors."). In reality, "even with 'quick-pay,' professional objectors have a bargaining chip to coerce a payoff" because class counsel still have an incentive to avoid an appeal. *Hart*, 334 F.R.D. at 77; 5 NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 13:8 (6th ed. 2024).

For proof that quick-pay provisions don't deter objectors, look no further than this case. The district court didn't think much of the objections to the settlement, and it doesn't hold the corresponding appeals in high regard either. (*See* Appeal Bond Order, R. 733, PageID 51926–38.) Still, an $850,000 appeal bond didn't stop the objectors from moving forward. (*Id.*, PageID 51926.) And if the objectors' appeals are indeed frivolous, it would only highlight the folly in thinking that quick-pay provisions "deter baseless objections." *Hart*, 334 F.R.D. at 77. Ultimately, paying the class lawyers first doesn't stop objections, whether or not they are made in good faith. The proper remedy is court-imposed sanctions for truly frivolous objections, or changes to the Rules or statutes. *Id.* at 78.

The Judicial Conference has the power to amend the Rules of Civil Procedure to further deter frivolous objections. Similarly, Congress could pass legislation to prevent professional objectors from holding up class action settlements. But district courts should not use quick-pay provisions as an attempted stand-in for the measures that protect due process, are consistent with the country's rules and laws, and might actually work. Dissatisfied class members are entitled to object and appeal. Plaintiffs' attorneys should not be permitted to undermine those rights with settlement provisions that enrich themselves at the expense of the settlement class.

If quick-pay provisions were truly intended to deter frivolous objections and protect the interests of the class, the class members would be allowed to collect their portion of the proceeds and return them if necessary—just like their attorneys. But these arrangements are made by attorneys for their own benefit. Authorizing such a provision requires one to believe that lawyers can be trusted with money they might not get to keep, but their clients cannot be trusted with money that belongs to them. In most instances, there is no reason for objector appeals to sabotage payouts to fellow class members—particularly if the issue comes down to the overall size of settlement or the attorneys' fees award. In fact, a better way to deter frivolous objections would be to make objectors choose between a quick payout upon consummation of the settlement or a delayed payment at the conclusion of their appeal. There is simply no good reason to pay attorneys based on the false promise

of objector deterrence and leave their clients—who actually need the compensation—to wait on money that will never have to be repaid.

Now, assume that the objectors' appeals present some close calls. There's reason to think they might, if only because counsel for the objectors is not a lawyer who might be considered a "professional objector." (Sheely Objection to Proposed Class Settlement, R. 485, PageID 7305 ("My attorney [David Graham] has objected to zero class action settlements in the past 5 years."); R. 558, R. 570 (listing Mr. Graham as counsel for the objectors).) If that's the case, the "best way to keep the lawyers engaged" to stave off the appeals is to provide a monetary incentive. *Hart*, 334 F.R.D. at 77. To that point, quick-pay provisions weaken the urgency for counsel to seek redress for the settlement class. So to align the incentives within the attorney-client relationship, this Court should scrutinize quick-pay provisions with great skepticism—and perhaps abolish them altogether. *See Dry Max Pampers*, 724 F.3d at 722 (this Court "consider[s] the alignment of interests and incentives" in deciding Rule 23 issues). And no matter how the objector appeals turn out, this Court should make its own judgments on them without mortgaging 27% the settlement funds on the unknowable prospects of several dozen plaintiffs' firms.

Moreover, this Court shouldn't presuppose that paying the attorneys first here is acceptable simply because it has referred to quick-pay provisions as "common" in the past. *Pelzer*, 655 F. App'x at 365. Many of these arrangements were authorized

through proposed orders written by plaintiffs' counsel for their own benefit. *Hart*, 334 F.R.D. at 78. But "the courts must carefully scrutinize" all Rule 23 issues through a "searching inquiry." *Dry Max Pampers*, 724 F.3d at 718; *Hart*, 344 F.R.D. at 78. The required judicial vigilance isn't possible if district courts just adopt every Rule 23 proposal that comes before them. *Hart*, 344 F.R.D. at 78. Moreover, "[o]rders drafted by counsel, especially those making findings of fact and conclusions of law that award counsel their own fees, should be given little precedential value." *Id.* (quoting *Sakiko Fujiwara v. Sushi Yasuda Ltd.*, 58 F. Supp.3d 424, 436 (S.D.N.Y. 2014)).

The East Palestine class members deserve better than unreasoned, "cookie-cutter jurisprudence." *Id*. But instead, the district court approved the settlement agreement and the attorneys' fees using orders that the Appellees drafted, without modifying them in any substantive way. (*Compare* R. 518-11, R. 519-4, R. 520-5, R. 538-5 (proposed orders on final settlement approval, plan of distribution, and attorneys' fees, expenses and service awards) *with* R. 555, R. 556, R. 557 (orders resolving those issues).) At the very least, the courts should explain to the uncompensated class members why their attorneys should benefit from their misfortune before they get anything. (*See* Nov. 1, 2024 Hearing Tr. at 26.) Rubber-stamping a proposal that eats away $162 million of the settlement fund does not show the careful scrutiny that Rule 23 demands.

## II. The District Court Lacked the Discretion to Abdicate its Fee Allocation Supervision Duties to Appellees.

The district court delegated oversight power over the allocation of attorneys' fees based on the idea that Appellees are "most familiar with the work done by each firm and each firm's overall contribution to the litigation." (R. 689, PageID 51081.) But Rule 23 does not allow the district court to hand over $162 million in settlement funds without guardrails, especially to parties with such a direct interest in the funds.

The delegation below rests on a faulty legal premise: because some courts have allowed "counsel to apportion fees amongst themselves," a complete delegation of that authority must be acceptable here. (*Id.*, PageID 51081–82 (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533 n. 15 (3d Cir. 2004); *In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL NO 1426, 2008 WL 63269, at *7 (E.D. Pa. Jan. 3, 2008).) That premise doesn't work in this case.

The first problem with that understanding of the law is that it's overbroad. Every class action settlement is different, so an approved fee allocation method in one case might be rejected in another. *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 424 F. Supp.3d 456, 497 (E.D. La. 2020) (quoting Manual for Complex Litigation § 14.121 (4th ed. 2004)) ("The decision of an award of attorneys' fees in a common-fund case is committed to the sound discretion of the trial court, which must consider the unique contours of the case."). Indeed, this Court has made clear that "the rationale for the [attorneys' fee] award is predominantly

fact-driven." *Gascho*, 822 F.3d at 279 (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 551 (6th Cir. 2008)).

The district court should have explained why its delegation decision was appropriate under the facts here. But there is no specific explanation on the record; the court cited the Appellees as "most familiar with the work done by each firm and each firm's overall contribution to the litigation" as the general reason for delegating its authority. (R. 689, PageID 51081–82 (quoting *In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL NO 1426, 2008 WL 63269, at *7 (E.D. Pa. Jan. 3, 2008).) This error was an abuse of discretion all on its own.

The second problem with the decision below is that a district court cannot abdicate its allocation discretion to class counsel. That's because the amount allocated *among* class counsel must be part of a court's careful scrutiny of a putative class action settlement. *See Dry Max Pampers*, 724 F.3d at 717–18. Indeed, Rule 23 "goes beyond concern for only the overall amount of fees awarded and requires attention to the fees allocated to individual class counsel." *In re Agent Orange*, 818 F.2d at 225. A court simply cannot evaluate the overall reasonableness of the fee award without reviewing how the allocations are made, as required by Rule 23(h). *See In re Wawa, Inc. Data Sec. Litig.*, 85 F.4th 712, 723–24 (3d Cir. 2023). It follows that class counsel cannot "divide the award amount themselves in *any* manner they deem satisfactory." *In re Agent Orange*, 818 F.2d at 223.

The district court and Appellees point to *Bowling v. Pfizer*, 102 F.3d 777 (6th Cir. 1996) as authorizing the district court to give Appellees complete control of the fee allocation. But *Bowling* was decided before Rule 23(h) was adopted. FED. R. CIV. P. 23, 2003 Advisory Committee Notes ("Subdivision (h) is new."). Before Rule 23(h), fee awards were not subject to an enumerated reasonableness requirement. *In re Wawa*, 85 F.4th at 723–24. Importantly, the 2003 Advisory Committee Notes to Rule 23(h) emphasize that "[i]n a class action, the district court must ensure that the amount and mode of payment of attorney fees are fair and proper . . . Even in the absence of objections, the court bears this responsibility." FED. R. CIV. P. 23, 2003 Advisory Committee Notes. Just as important, courts are now directed to consider "agreements between class counsel and others about the fees claimed by the motion" because "[s]ide agreements regarding fees provide at least perspective pertinent to an appropriate fee award." Quite plainly, Rule 23(h) is just as concerned with fee allocations between plaintiffs' counsel as it is with the overall size of the fee award.

Considered in its full context, the addition of Rule 23(h) means that a district court cannot satisfy its fiduciary oversight duties by delegating fee allocation to class counsel. *See In re Sulfur Content Gasoline Prods.*, 517 F.3d at 228 (requiring courts "to ensure that attorneys' fees are . . . divided up fairly among plaintiffs' counsel"). More directly, the addition of Rule 23(h) makes the fee division reasoning in the *Bowling* case dead letter. As a result, the district court erred by concluding that it

had the discretion to "not become involved" in fee division matters—that involvement is a required aspect of a proper Rule 23(h) reasonableness review. (*See* R. 689, PageID 51082 (citing *Bowling*, 102 F.3d at 781).)

The Judicial Conference had good reason to change Rule 23 to foreclose the abdication of oversight that happened here. Lead class counsel has an incentive to be unfair to their co-counsel if left to their own devices. *See* 5 NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 15:23 (6th ed. 2024) ("[L]ead counsel is invariably conflicted in that it is not just allocating money among others but identifying its own share of the aggregate fee award, that is, self-allocating."). As such, a court cannot approve a fee allocation process that makes it impossible for the settlement class, interested attorneys, and the public to discern how attorney work was valued. *In re High Sulfur Content Gasoline*, 517 F.3d at 232.

And other authority interpreting the current version of Rule 23 confirms that "it is the court that has the final authority on how the fee is allocated among counsel. 5 NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 15:23 (6th ed. 2024); *see also In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1206–07 (10th Cir. 2023) (quoting *Victor*, 623 F.3d at 90). ("[I]t is neither unusual nor inappropriate for courts to consider lead counsel's proposed allocation of attorneys fees . . . where the district court retains the ultimate power to review applications and allocations and to adjust them where appropriate."). Without the district court's exercise of final authority,

what's to stop one of the Appellee firms from taking every cent of the fee award and leaving their co-counsel penniless? That wouldn't be in keeping with the court's obligation to "make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved." *Rawlings*, 9 F.3d at 516.

Just as bad, when a court abdicates its allocation discretion, it opens the door to self-dealing between allied firms. *See* FED. R. CIV. P. 23, 2003 Advisory Committee Notes (discussing the court's duty to oversee "agreements between class counsel and others about the fees claimed by the motion"). This case helps illustrate the point. At the outset, there were competing co-lead slates. (*See* R. 28 (discussing the *Feezle* Leadership Group and Team Ohio's bids to run the case).) Without independent court oversight, leadership candidates might buy off competitor firms with the promise of fees untethered from hours worked or case performance. Once that happens, the lawyers have encroached into money that should go to their clients—and then, the settlement isn't fair. *See In re TikTok, Inc. Consumer Privacy Litig.*, 617 F. Supp.3d 904, 939 (N.D. Ill. 2022) ("every dollar the attorneys receive is a dollar that the class does not").

These unfair allocation outcomes emphasize the importance of the common fund doctrine. Both threshold requirements for applying that doctrine are present here: (1) there is a lump sum common fund from the settlement money; and (2) the fund is under the court's supervision pursuant to FED. R. CIV. P. 23(e)(2). 5

NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 15:57 (6th ed. 2024). Under the common fund doctrine, counsel who were partially responsible for the recovery remain entitled to a fair fee—even if they were not selected for a leadership position. *Id.* §§ 15:57, 15:60.

By leaving the non-co-lead attorneys without a way to show that the Appellees undervalued their contributions, the court violated the common fund doctrine. Just as there is no way to evaluate the value of attorney work on this record, "[o]ne cannot even compare apples to oranges without knowing what the oranges are." *In re High Sulfur Gasoline Prods.*, 517 F.3d at 232. And attorneys whose work benefitted the class should be compensated for it. *See Gottlieb v. Berry*, 43 F.3d 474, 491 (10th Cir. 1994) (reversing a district court that refused to provide compensation for arguments that prompted certain fee and expense awards, increasing class recovery). The Appellees didn't do all the work and they shouldn't have the unilateral authority to discount the important contributions of other firms.

That's especially true when it comes to the case team led by Morgan & Morgan. The diligent work of Morgan & Morgan attorneys played a critical role in convincing the settling defendants that class resolution would be preferable to individual litigation. (Nov. 1, 2024 Hearing Tr. at 30–33 (discussing "the leverage offered by the contingency fee lawyers with clients . . . [who] helped propel this to a very successful resolution for the community.").) But that wasn't reflected in

Morgan & Morgan's fee allocation. (*Id.* at 32 (arguing that Morgan & Morgan's allocation failed to reflect the firm's value add to the case).) And Mr. Morgan never had a real chance to explain that to the district court because of the delegation provision. (*Id.* at 33 (discussing Mr. Morgan's inability to provide specific evidence of discrepancies in the fee allocation because the Appellees shielded their methodology from outside view).)

Mr. Morgan's effort to obtain answers about the fee allocation were unjustifiably cut off by the Appellees' deceptive use of proposed orders to further their own interests. Nothing in the record signifies Morgan & Morgan's demotion from co-lead status—a position that should have given Mr. Morgan access to the fee allocation decisions. Tellingly, Morgan & Morgan and Mr. Morgan are listed above the heading "*Plaintiffs' Co-Lead and Class Counsel*" on the very filing that Appellees used to give themselves complete discretion over the fee allocation process. (R. 538, PageID 12349.) That heading makes sense because Mr. Morgan knew at least as much about the ingredients that went into the class settlement as any of the Appellee attorneys. Conversely, the Appellees' use of that proposed order to exclude Morgan & Morgan from the fee allocation process made no sense. In so doing, the Appellees repudiated the case management orders that should have assisted the court in fulfilling its Rule 23(h) responsibilities. (R. 28; R. 33.) The court should not have allowed the Appellees to pick winners and losers among the

plaintiffs' firms without Morgan & Morgan's input, which was necessary to inform its discretion. Mr. Morgan was a case co-lead and he deserved a say—but more importantly, the court needed his voice to resolve the fee allocation issues.

On that note, the district court erred by diminishing Morgan & Morgan's fee allocation concerns as analogous to a discovery dispute. (R. 689, PageID 51085.) Discovery disputes are a natural byproduct of the adversarial process and lawyers are fully incentivized to zealously pursue the interests of their clients in litigating a motion to compel or for a protective order, for example. The adversarial incentives are so strong that the Rules of Civil Procedure forbid judicial involvement before counsel makes a good-faith effort to resolve the discovery issue on their own. FED. R. CIV. P. 37(a)(1). But, as discussed above, the incentives for counsel are inverted when it comes to fee awards and allocations in common fund cases. *Dry Max Pampers*, 724 F.3d at 717–18. Therefore, the Court trivialized its affirmative duty to oversee the common fund by comparing it to its authority to resolve an intractable discovery dispute.

The court's maladministration of the fee allocation only gets worse in light of the Appellees' unauthorized use of Mr. Morgan's signature. That conduct had the effect of misleading the settlement class and the public about Morgan & Morgan's support for the Appellee's quick-pay scheme and their mysterious fee allocation method. (R. 664-1, PageID 46333.) The opacity of the Appellees' methodology and

38

their deception of Mr. Morgan should have been glaring "red flags" for the district court. *See* 5 NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 15:23 (6th ed. 2024). After the Appellees used Mr. Morgan's signature without telling him about their fee allocation plans, why would the public have any confidence that they didn't "exploit the class action device to obtain large fees at the expense of the class"? *Strong*, 137 F.3d at 849. If the Appellees were willing to sign Mr. Morgan's name to a fee allocation plan he that wouldn't support, they were surely willing to hide dirty secrets about their allocation methodology. The court should have paid heed to the Appellees' deception and stripped them of their unfettered discretion over the fee award.

To be sure, "[a] request for attorney's fees should not result in a second major litigation." *In re Wells Fargo & Co. Shareholder Derivative Litig.*, 445 F. Supp.3d 508, 532 (N.D. Cal. 2020) (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011); *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). That said, district courts have several tools to ensure their oversight of attorneys' fee allocations do not consume "scarce judicial resources." *Gascho*, 822 F.3d at 280 (quoting *Rawlings*, 9 F.3d at 516–17). To save time, a court may appoint a special master to oversee fee allocation and the details supporting it. *See, e.g.*, *In re High Sulfur Content Gasoline Prods.*, 517 F.3d at 232 n. 18 ("Other guidelines for minimal procedural protections appear in the federal rules governing special masters and magistrate judges, who may be asked by a

district court to oversee an attorneys' fee allocation"). Even more efficient, a court may retain jurisdiction over the settlement agreement and fee allocation process to "protect[] against any potential abuse"—even when lead counsel is more familiar with the fee issues. *See, e.g.*, *In re Auto. Refinishing Paint Antitrust Litig.*, 2008 WL 63269, *7 (E.D. Pa. Jan. 3, 2008). These safeguards might seem small, but they are much better than ceding settlement funds to lawyers with no guarantee that the money will end up where it belongs. At its core, the district court's error in this case is no different than the one at issue in the *In re High Sulfur Content Gasoline Products* case: it did not shine a light on the allocation process so that the Appellees couldn't exploit the common fund for their own benefit. 517 F.3d at 227, 232 n. 18 ("The transparency and completeness of special master and magistrate judge procedures highlight the abnormality of the district court's approach here.").

This dispute comes down to two ways of dealing with attorneys' fees. The district court chose to allow lead counsel to do whatever they want with the fee award once it's carved out from the common fund. Circuit-wide endorsement of this practice would create bad incentives for plaintiffs' counsel and distract them from pursuing their clients' interests. *See In re Diet Drugs*, 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J., concurring) ("But counsel have inherent conflicts. They make recommendations on their own fees and thus have a financial interest in the outcome. How much deference is due the fox who recommends how to divvy up the

40

chickens?"). The better way is to reemphasize judicial oversight over common fund issues, including the allocation of attorneys' fees. Therefore, the Court should send a clear message: complete delegation of attorneys' fee awards to the lead class counsel is not allowed in this Circuit.

### III. The District Court Abused its Discretion when it Failed to Scrutinize the Appellees' Method for Allocating the Award of Attorneys' Fees.

Morgan & Morgan's motion to enjoin the distribution of attorneys' fees gave the district court an opportunity make up for uncritically accepting the Appellees' proposed order on the subject. (R. 664, PageID 46330 (moving for "a process for judicial review of the fee allocation").) But the court rejected the motion without imposing any oversight on the Appellees.

Federal courts have an independent obligation to ensure the reasonableness of a fee award. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). That means a district court cannot take the parties' word for it when it comes to attorneys' fees. *Dry Max Pampers*, 724 F.3d at 713, 717–18. In practice, a court should reject fee applications that aren't supported by enough information to perform the required reasonableness scrutiny. *See, e.g.*, *In re High Sulfur Content Gasoline Prods.*, 517 F.3d at 232 (reversing "[b]ecause Appellants were deprived of information necessary to contest their fee awards, and the court's review did not allow comparison between Appellants' and other attorneys' awards"); *Vazquez v. A+ Staffing LLC*, --- F. Supp.3d ---, 2024 WL 3966246, at *19 (E.D.N.Y. Aug. 27,

2024) (rejecting a fee petition because, in the context of the settlement, the court was "unable to properly consider the proposal for attorney's fees").

At the November 1, 2024 telephonic status conference, Appellees made verbal representations about how they divided the attorneys' fees among the plaintiffs' firms. (Nov. 1, 2024 Hearing Tr. at 16–17.) But the district court did not require Appellees to provide the "granularity" it would have taken to verify their allocation methods. (*Id.* at 17.) Nor did the court require Appellees to submit a substantive response to Morgan & Morgan's motion on the public docket. (*Id.* at 18–19.) So there is no publicly-accessible way to verify that the attorneys' fees went where they were supposed to go.

The district court's order on Morgan & Morgan's motion does not quell concerns about the Appellees' allocation method. Without citing any documentary evidence, it regurgitates the presentation the Appellees made at the November 1, 2024 status conference. (R. 689, PageID 51083–85.) The court also found—without support—that each law firm was paid "under the process set forth in the Time and Expense Billing Guidelines and Case Management Order (ECF No. 33)." (*Id.*, PageID 51083.) How did the district court know these things to be true? The district court never says, and there is no evidence of what it claims it reviewed. *Dry Max Pampers*, 724 F.3d at 718; *see In re High Sulfur Content Gasoline*, 517 F.3d at 230 ("Because the factual basis of the court's fee allocation remains unknown, this court

cannot approve it."). And, again, Mr. Morgan's input was necessary for a full picture of the allocation issues. As appointed co-lead throughout the case, Mr. Morgan made strategic calls about the case, assigned work to co-counsel firms, and enforced the court-approved case-leadership structure and billing guidelines. So if Mr. Morgan couldn't understand the fee allocation method the Appellees used based on his co-lead status, there is no way the court had enough information to approve it.

There is also a mismatch between the method the district court used to justify the $162 million fee award and the Appellees' purported allocation method. The court applied the "percentage-of-the-fund" method and then found 27% of the common fund to be a reasonable fee. (R. 556, PageID 14562–75.) The value provided to the class, the risk the plaintiffs' firms took with the case, the complexity of the litigation, and the professionalism of all the attorneys formed the key aspects of the reasonableness finding. (*Id.*) On the flipside, the district court discounted the "value of the attorneys' services on an hourly basis" and declined to "employ an exhaustive or precise lodestar cross check." (*Id.*, PageID 14570 (citing *In re Flint Water Cases*, 583 F. Supp.3d 911, 941 (E.D. Mich. 2022).) So far, so good.

But then, the court allowed the Appellees to take the quality-based metrics supporting the total fee award and flip them on their head when it was time to pay their co-counsel. The foundation for the allocation method was hours—more like the lodestar method the court discounted in deciding the total fee award. (Nov. 1, 2024

Hearing Tr. at 9.) Then, after tallying the hours of each firm, the Appellees used "different multipliers" to calculate their share of the fee award. (*Id.*) Yet nobody understands these "different multipliers"—except for Appellees. (*Id.* at 34–35; *see* R. 664-1, PageID 46334 ("The effect of the … Order is that class counsel have seemingly unreviewable discretion to allocate fees to counsel without the Court's review or transparency.").) Plus, the Appellees admitted they gave themselves a premium multiplier based on their status as co-leads. (Nov. 1, 2024 Hearing Tr. at 9.)

So all things considered, the Appellees had many of their colleagues work for a regular hourly rate, while they rewarded themselves with a premium multiplier on their own hours. Maybe that allocation framework was justified based on how the firms funded the litigation—but there is simply no way to support such a judgment on this record. *See* 5 NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 15:23 (6th ed. 2024) ("The results of the [fee allocation] process should be transparent to all involved and to the class itself."). More likely is that Appellees picked winners and losers when allocating the fee award and the district court let them get away with favoritism and self-dealing. *Id.* ("While the court might be inclined to defer to the recommendations of lead counsel, it should not do so if there are red flags suggesting a flawed process."). This Court should ensure that the Appellees didn't use premium multipliers as cover for a slush fund that doesn't relate back to the results of the case.

Finally, the district court erred by faulting Mr. Morgan for not objecting until it became clear that the Appellees planned to distribute attorneys' fees during the pendency of the objector appeals. (R. 689, PageID 51081, 51086.) While it's true that the quick-pay provision appeared in the original settlement agreement, there wouldn't have been any problem with the arrangement described therein unless and until objector appeals pushed the lawyers' payouts ahead of their clients' compensation. Plus, the delegation language that effectively excluded Morgan & Morgan from exercising oversight authority over the fee allocation did not appear until much later, when the Appellees filed their reply to the motion for attorneys' fees without clearing the offending language with Mr. Morgan first. So the quick-pay issue did not become ripe until the Appellees abused it to take attorneys' fees out of a common fund that was frozen by objectors' appeals—all without Mr. Morgan's input. *See City Commc'ns, Inc. v. City of Detroit*, 888 F.2d 1081, 1089 (6th Cir. 1989) (discussing the ripeness doctrine, which precludes federal courts from deciding "hypothetical questions or possibilities). In other words, Mr. Morgan could not have anticipated the problems with Appellees' fee distribution plan when he signed the settlement agreement and attended the fairness hearing.

The same idea is even stronger when it comes to Morgan & Morgan's lack of objection to the delegation language in the reply to the motion for attorneys' fees. (*See* R. 538-5, PageID 12399–12400.) But more than that, Mr. Morgan cannot be

held responsible for overlooking language that was intentionally concealed from him. Again, the Appellees signed Mr. Morgan's name to a reply brief that they never shared with him and buried the offending language on the last two pages of the fifth exhibit. (R. 664-1, PageID 46333.) In general, it is inappropriate to raise new issues in a reply brief. *See Little Hocking Water Ass'n, Inc. v. E.I. Du Pont de Nemours & Co.*, No. 2:09-cv-1081, 2013 WL 1196606, at *22 (S.D. Ohio Mar. 25, 2013).

The Appellees shouldn't have been able to add the delegation language in their reply brief, thereby fundamentally changing the proposed fee allocation method. The only way Morgan & Morgan could have known about the Appellees' devious changes is if its attorneys had been able to compare the original proposed order on attorneys' fees to the modified version attached to the reply brief. But again, the Appellees included Mr. Morgan's signature on the reply brief without ever sending it to Morgan & Morgan. As a result, Mr. Morgan never saw the offending language—and then the Appellees made sure he didn't get to see their allocation methods either.

Just as important, affixing the name of another attorney to a filing after modifying it without their consent is a serious overstep. *See Lewis*, 652 F. Supp. at 890 (providing that the integrity of a judgment is undermined when it is based on an attorney's unauthorized conduct). After all, the purpose of the signature requirement is to bind the "individual signer [to] his personal, nondelegable responsibility . . . to

validate the truth and legal reasonableness of the papers filed." *Business Guides, Inc. v. Chromatic Commnc'ns Enters., Inc.*, 498 U.S. 533 (1991) (quoting *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 126 (1989)). When the Appellees put Mr. Morgan's signature on that reply brief, they misled the district court about his approval of its contents and jeopardized his integrity with the court. And this Court should not impute constructive knowledge of the reply brief to Morgan & Morgan with the Appellees' sleight of hand in full view. In total, one cannot say that Morgan & Morgan conceded any argument on the fee allocation after the Appellees eliminated its oversight responsibilities with hidden language buried in an attachment to a reply brief.

## CONCLUSION

The trial court erred by authorizing the quick-pay provision and delegating its oversight authority over the fee award to the Appellees. The quick-pay provision enriched the attorneys without protecting the best interests of the train derailment victims. Likewise, the court—not the Appellees—must hold final discretion over the allocation of attorneys' fees. Morgan & Morgan respectfully requests an Order reversing the district court's quick-pay decision, directing the plaintiffs' firms to refund their fee allocation, and requiring the district court to oversee a new fee allocation upon disposal of the objectors' appeals.

Respectfully submitted,

*/s/ Aaron M. Herzig*
Aaron M. Herzig
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Phone: (513) 381-2838
aherzig@taftlaw.com

David C. Roper
Taft Stettinius & Hollister LLP
41 S High Street, Suite 1800
Columbus, OH 43215-4213
Phone: (614) 221-4000
droper@taftlaw.com

*Counsel for Interested-Party Morgan
& Morgan*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g), I certify that this brief:

(1) complies with the type-volume limitation of Rule 32(a)(7) because it contains 11,302 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f) and

(2) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word and is typeset in Times New Roman in font size 14.

Dated: March 3, 2025

*/s/ Aaron M. Herzig*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 3, 2025, I electronically filed the foregoing brief with the Clerk of the Court using the appellate CM/ECF system, which served copies of the brief on all ECF-registered counsel.

Dated: March 3, 2025

*/s/ Aaron M. Herzig*

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Description of Entry | Record No. | PageID # |
|---|---|---|
| | | |
| Order Appointing Interim Class Counsel | R. 28 | 549-571 |
| Consolidation Order | R. 30 | 665-666 |
| Procedural Case Management Order No. 1 | R. 33 | 782- |
| First Amended Master Consolidated Class Action Complaint and Jury Demand | R. 138 | 1771-1876 |
| Motion for Preliminary Approval of Settlement | R. 452 | 5955-5957 |
| Memorandum in Support of Motion for Preliminary Approval of Settlement | R. 452-1 | 5958-6000 |
| Settlement Agreement | R. 452-2 | 6001-6074 |
| Proposed Settlement Approval Order | R. 452-7 | 6139-6146 |
| Objection to Class Settlement Agreement – Rev. Joseph Sheely | R. 485 | 7304-7318 |
| Objection to Class Settlement Agreement – Jami R. Wallace | R. 486 | 7971-7990 |
| Proposed Order Granting Final Approval of Settlement | R. 518-11 | 11205-11211 |
| Proposed Order Granting Plaintiffs' Motion for Approval and Implementation of the Plan of Distribution | R. 519-4 | 11300-11303 |
| Proposed Order Granting Attorneys' Fees, Expenses, and Service Awards | R. 520-5 | 11525-11550 |
| Response to Motion for Final Approvement of Settlement | R. 529 | 11590-11606 |
| Reply in Support of Application for Attorneys' Fees and Expenses and for Service Awards | R. 538 | 12344-12350 |
| Revised Proposed Order Granting Attorneys' Fees, Expenses, and Service Awards | R. 538-5 | 12374-12400 |
| Transcript of Proceedings – Fairness Hearing | R. 553 | 14423-14541 |
| Order on Motion for Approval and Implementation of the Plan of Distribution | R. 555 | 14543-14546 |

| | | |
|---|---|---|
| Order on Motion for Award of Attorney Fees and Expenses | R. 556 | 14547-14579 |
| Order on Motion for Final Approval of Settlement | R. 557 | 14580-14586 |
| Joseph Sheely's Notice of Appeal | R. 558 | 14587 |
| Zsuzsa Troyan's Notice of Appeal | R. 570 | 14768 |
| Morgan & Morgan's Motion to Clarify, Alter, Amend or Reconsider ECF 556 | R. 664 | 46330-46331 |
| Morgan & Morgan's Memorandum in Support of Motion to Clarify, Alter, Amend or Reconsider ECF 556 | R. 664-1 | 46332-46345 |
| Order Denying Motion to Clarify, Alter, Amend or Reconsider ECF 556 | R. 689 | 51079-51089 |
| Order Granting Motion to Lift Restrictions on Use of Transcript | R. 729 | 51830 |
| Memorandum of Opinion and Order | R. 733 | 51926-51938 |