No. 24-4086

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————————

IN RE: EAST PALESTINE TRAIN DERAILMENT

———————————————

MORGAN & MORGAN,

*Interested Party-Appellant*

v.

ZOLL & KRANZ, LLC; BURG SIMPSON ELDREGE HERSH & JARDINE,
P.C; GRANT & EISENHOFFER, P.A.; SIMMONS HANLY CONROY; LIEFF
CABRASER HEIMANN & BERNSTEIN, LLP,

*Interested Parties-Appellees.*

———————————————

On Appeal from the United States District Court
for the Northern District of Ohio
Docket No. 4:23-cv-242
The Honorable Benita Y. Pearson

———————————————

**REPLY BRIEF OF APPELLANT MORGAN & MORGAN**

Aaron M. Herzig                     David C. Roper
Taft Stettinius & Hollister LLP     Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800       41 South High Street, Suite 1800
Cincinnati, OH 45202                Columbus, OH 43215
Phone: (513) 381-2838               Phone: (614) 221-2838
aherzig@taftlaw.com                 droper@taftlaw.com


*Attorneys for Interested Party-*                Dated: June 6, 2025
*Appellant T. Michael Morgan and*
*Morgan & Morgan*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………... ii

INTRODUCTION ………………………………………………………... 1

ARGUMENT ……………………………………………………………... 4

I.  The District Court Abdicated its Rule 23(h) Oversight Responsibilities in Favor of a "Trust, and Don't Verify" Approach. …………………………. 4

II. The Quick-Pay Provision Operationalized the District Court's "Trust, and Don't Verify" Misstep. ………………………………………………… 12

   A.  Morgan & Morgan has Standing to Challenge The Quick-Pay Provision—the Distribution Issue—Alongside the Allocation Issue. ………………………………………………………………… 13

   B.  Morgan & Morgan Timely and Appropriately Raised the Quick-Pay Issue with the District Court. ……………………………………… 18

CONCLUSION ………………………………………………………… 26

CERTIFICATE OF COMPLIANCE ……………………………………… 28

CERTIFICATE OF SERVICE ………………………………………….. 29

# TABLE OF AUTHORITIES

**Cases**

*Bowling v. Pfizer*,
102 F.3d 777 (6th Cir. 1996) ....................................................................8

*Boykin v. Fam. Dollar Stores of Mich.*,
3 F.4th 832 (6th Cir. 2021) ......................................................................6

*Camara v. Mastro's Restaurants*,
952 F.3d 372 (D.C. Cir. 2020) ..................................................................6

*Clearman v. Kochanowski*,
No. 21-20518, 2022 WL 2163781 (5th Cir. June 15, 2022)......................5

*Deposit Guaranty Nat'l Bank v. Roper*,
445 U.S. 326 (1980).................................................................................16

*Gillispie v. Miami Twp., et al.*,
Nos. 23-3999, 23-4000, 23-4001, 2025 WL 1276900 (6th Cir. May 2, 2025) .......18

*Hart v. BHH, LLC*,
334 F.R.D. 74 (S.D.N.Y. 2020) ........................................... 12, 19, 24, 25

*In re Capital Contracting*,
924 F.3d 890 (6th Cir. 2019) ..................................................................16

*In re Diet Drugs Prods. Liab. Litig.*,
401 F.3d 143 (3d Cir. 2005)....................................................................11

*In re Dry Max Pampers Litig.*,
724 F.3d 713 (6th Cir. 2013) ........................................................ passim

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
55 F.3d 768 (3d Cir. 1995).......................................................................3

*In re High Sulfur Content Gasoline Prods. Liab. Litig.*,
517 F.3d 220 (5th Cir. 2008) ......................................................... passim

*In re Nat'l Prescription Opiate Litig.*,
976 F.3d 664 (6th Cir. 2020) ....................................................................... 13, 16, 17

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004)...........................................................................8, 9

*Pedreira v. Sunrise Children's Servs., Inc.*,
802 F.3d 865 (6th Cir. 2015) ...........................................................................16

*Pelzer v. Vassalle*,
655 F. App'x 352 (6th Cir. 2016) .....................................................................26

*Strong v. BellSouth Telecomm., Inc.*,
137 F.3d 844 (5th Cir. 1998) ...........................................................................6, 7

*U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*,
444 F.3d 462 (6th Cir. 2006) ...........................................................................17

*United States v. Adams*,
124 F.4th 432 (6th Cir. 2024) ..........................................................................11

*United States v. Perry*,
360 F.3d 519 (6th Cir. 2004) ...........................................................................16

*Vanguards of Cleveland v. City of Cleveland*,
753 F.2d 479 (6th Cir. 1984) ...........................................................................16

**Rules**

FED. R. CIV. P. 23 ............................................................................... passim

## INTRODUCTION

Without judicial oversight, and after cutting out Appellant Co-Lead Counsel T. Michael Morgan and Morgan & Morgan ("Appellant" or "Morgan & Morgan"), Appellee Co-Lead Class Counsel law firms Zoll & Kranz, LLC, Burg Simpson Eldredge Hersh & Jardine, P.C., Grant & Eisenhofer P.A., Simmons Hanly Conroy, and Lieff Cabraser Heimann & Bernstein, LLP (collectively the "Appellees") distributed $162 million in attorney's fees before their clients received damages awards. The Appellees did not explain how they calculated each firm's share; in Morgan & Morgan's case, they just provided a number and asked for the firm's wire instructions. This slapdash process illustrates the problem with quick-pay. In haste to pay the lawyers, quick-pay allows class counsel to divide up huge portions of settlement money before a court has any chance to say anything to say about it. And for what benefit to the plaintiffs? None.

For the sake of the settlement class and his co-counsel, Mr. Morgan asked for a halt to the Appellees' fee distributions until the district court could ensure two things. First and foremost, no money that might belong to class members should be at risk while a handful of objector appeals remain unresolved. Second, each firm that advanced the interest of the settlement class should receive reasonable compensation, without disparate treatment from the Appellees.

The district court dismissed Morgan & Morgan's objection to paying the lawyers before class members without double-checking the Appellees' methodology. Instead, the court authorized the quick-pay provision, and the Appellees took advantage by distributing the fee award. The Appellees' allocations were never scrutinized for equal treatment of law firms and compatibility with the approved billing guidelines. These distribution and allocation problems are interrelated and inseverable. Both problems show that the court ran afoul of its Rule 23 obligations.

Nothing in the Appellees' brief justifies the way they handled the money from the common fund. So their primary strategy is to create the illusion that Mr. Morgan raised speculative objections after it was too late. They level personal attacks against him for his purported "lack of diligence" and "engag[ing] in unfounded speculation" (Appellees' Br. at 16, 22), but these discourtesies are pure projection. The Appellees authored a quick-pay provision to advantage themselves at the expense of any meaningful oversight. In fact, the Appellee law firms never revealed their fee calculations, and to this day, they still have not told any court what they paid each law firm. As a result, there remains no way to know whether Morgan & Morgan or any other firm received inappropriate compensation. (*See* Appellees' Br. at 41.) The district court's purported "oversight" was oversight in name only. This Court should not countenance an "especially lucrative opportunit[y] for putative class attorneys to

generate fees for themselves without any effective monitoring." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 719 (6th Cir. 2013) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 788 (3d Cir. 1995)).

Quick-pay is as much to blame when it comes to the unanswered questions about the fee award, and the Appellees' cannot employ a strategy of avoidance that keeps the spotlight off the dollars and cents. Ultimately, the problem is that the Appellees went out of their way to avoid "showing their work" on the fee allocation—not Mr. Morgan's attempts to get answers for himself, his co-counsel, and the people of East Palestine. This "trust, and do not verify" paradigm should not be permissible, especially in tandem with the Appellees' preference for "I get paid, you wait" settlements.

At bottom, the district court allowed the Appellees to walk away with $162 million without making sure that each law firm got paid a fair share of the common fund. Quick-pay amplifies the problem by placing self-interested law firms between the court and the settlement money it is charged with overseeing. The district court did not hold the Appellees accountable to Rule 23 and this Court should step in to correct the allocation and distribution errors.

# ARGUMENT

## I. The District Court Abdicated its Rule 23(h) Oversight Responsibilities in Favor of a "Trust, and Don't Verify" Approach.

The Appellees try to make it seem as if the district court delegated its "initial allocation authority" to them, and later checked their work by "[a]pproving [their] [a]llocation of [f]ees." (Appellees' Br. at 29, 40.) That is not what happened.

The Appellees' fee allocations only came to the district court *after* the Appellees had already distributed the fee award, and the court didn't even give cursory review to the allocation methodology. Quick-pay allowed for this complete deferral to class counsel. This self-validating process below violates the Fifth Circuit's synthesis of the law on point: "the district court must not cursorily approve the attorney's fee provision of a class settlement or delegate that duty to the parties." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 228 (5th Cir. 2008). A small group of attorneys cannot be allowed "to declare how an award will cover themselves and [legion co-counsel firms] with no meaningful judicial supervision or review." *Id.* at 234. Failure to exercise the appropriate judicial review is an abuse of discretion. *See Dry Max Pampers*, 724 F.3d at 721.

Appellees' brief harps on the fact that the district court allegedly retained oversight authority because it says so in the settlement agreement and the mirroring language in the final approval orders. (Appellees' Br. at 11–12, 31, 34, 40.) That's irrelevant—whether in the agreement or not, the district court had a duty to supervise

the allocation of attorney's fees in its settlement approval deliberations. And whether in the agreement or not, the court must exercise the power it is given, which did not happen here.

The relevant question is whether the district court actually verified the Appellees' compliance with the "model and methodology" described in "the [c]ourt's Order (ECF No. 556)" when they allocated the attorney's fees. (Order Denying Morgan & Morgan's Fee Mot., R. 689, PageID 51082.) The clear answer is no. As the Appellees concede, "the district court [did] not dig into the allocation methodology with granularity" at any point in the proceedings below. (Appellees' Br. at 18.) So the district court never required the Appellees to substantively address Mr. Morgan's concern that "[e]ven after talking with class counsel, it was unclear to him how the class counsel calculated the allocation for Morgan & Morgan or for any other firm." (Order Denying Morgan & Morgan's Fee Mot., R. 689, PageID 51085 (quoting Mot. to Enjoin Attorney's Fee Award, R. 664-1, PageID 46335).) Consequently, the record contains no assurances that the Appellees paid Morgan & Morgan—or any of the other plaintiffs' firms—for the reasonable value of their work. *Clearman v. Kochanowski*, No. 21-20518, 2022 WL 2163781, at *2 (5th Cir. June 15, 2022) ("The district court is tasked with ensuring that the attorney's fee award is fair and reasonable, and that includes the individual fee awards."). Reversal is necessary to reemphasize the judiciary's "oversight function" and "deflect the

potential public misunderstandings that they may cultivate in regard to the interests of class counsel." *High Sulfur*, 517 F.3d at 228 (quoting *Strong v. BellSouth Telecomm., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998)).

The Appellees also feign offense at the assertion that they "improperly used [Mr. Morgan's] signature in the filing where the allocation designation was proposed" and incorrectly argue that there is no "evidence to substantiate such a serious claim." (Appellees' Br. at 33.) First of all, Mr. Morgan was not required "to prove a negative" by coming up with affirmative evidence of something that did not happen; in this case, evidence that the Appellees filed the relevant proposed order without sending it to him. *Boykin v. Fam. Dollar Stores of Mich.*, 3 F.4th 832, 842 (6th Cir. 2021) (quoting *Camara v. Mastro's Restaurants*, 952 F.3d 372, 375 (D.C. Cir. 2020)). In good faith, Mr. Morgan informed the district court that his "signature block was use[d] for this Reply brief at its exhibit, despite it not being provided to [him] before its filing." (Mot. to Reconsider & Enjoin Order on Attorney's Fees, R. 664-1, PageID 46333.) Mr. Morgan placed the misuse of his signature in the record under pain of sanctions. It is the Appellees that have never refuted Mr. Morgan's assertion with evidence to the contrary.

The evidence indicates that Mr. Morgan never got the proposed order granting the Appellees the "authority to distribute the fees in a manner that, in the[ir] judgment fairly compensate[d] each firm." (Appellees Br. at 10 (quotation omitted).)

To start, the Appellees never deny that they filed the proposed order without sending it to Mr. Morgan. Tellingly, the Appellees only reemphasize that the unchecked allocation and distribution authority they claim "[did] not include Morgan." (Appellees' Br. at 10.) In other words, the Appellees planned to exclude Mr. Morgan from the fee allocation and distribution process all along. (*See, e.g.*, *id.* at 10–11 (discussing the Appellees' discretion set forth in the reply proposed order in question).) So it makes perfect sense that the Appellees didn't think to ask Mr. Morgan about a proposed order that excluded him from fee allocation and distribution—even if the Appellees had no malintent.

In any event, the district court accepted the Appellees' proposed order without any substantive changes. This only highlights the broad problem with the attorney's fees decision: the delegation to the Appellees was so complete that it amounted to an abdication. *Compare* R. 538-5 (proposed order on attorney's fees attached to the Appellees' reply brief) *with* R. 556 (order granting the same). This Court should reject the unreviewed aspects of the attorney's fee decision for that reason alone. FED. R. CIV. P. 23(e)(2)(C)(iii) (mandating scrutiny of "the terms of any proposed award of attorney's fees, including timing of payment"); *High Sulfur*, 517 F.3d at 228 (quoting *Strong*, 137 F.3d at 850) ("the district court must not cursorily approve the attorneys' fee provision of a class settlement or delegate that duty to the parties.").)

The Appellees try to excuse the district court's lacking fee allocation oversight in several different ways, but to no avail.

*First*, the Appellees allude to an extreme approach that would authorize their unbridled control over fee allocation issues. They refer to fee allocations as a "private matter" that is "generally irrelevant" to the oversight duties the court owes to the settlement class. (Appellees' Br. at 36–37 (quoting *Bowling v. Pfizer*, 102 F.3d 777, 781 (6th Cir. 1996); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533 n. 15 (3d Cir. 2004).) Under this bygone approach to fee oversight, a district court only had to ensure that class counsel "are paid only what their *collective* work is worth." *Bowling*, 102 F.3d at 781 (emphasis added). But it would be impossible to determine whether a settlement "gives preferential treatment to class counsel" if a court treats fee allocation issues as entirely outside its purview. *Dry Max Pampers*, 724 F.3d at 718. Put another way, fee allocations cannot be a purely "private matter"—otherwise, the Appellees could, in fact, take every cent of the fee award and leave their co-counsel penniless and without recourse. (*See* Appellees' Br. at 39 (acknowledging that the Appellees could not "divide the award among themselves in *any* manner they deem satisfactory").). Such a regime could not support the principles of fairness, reasonableness, and transparency that Rule 23 is designed to safeguard. *High Sulfur*, 517 F.3d at 227–28. Superficially, the Appellees disclaim the authority to engage in favoritism or "leav[e] their co-counsel penniless"

(Appellees' Br. at 40), but practically their arguments would allow for those outcomes. If allocations are truly "for the attorneys to resolve amongst themselves," it is not "hyperbole" to say that the Appellees could have paid Morgan & Morgan $1 without fear of intervention from a court. (*Id.* at 37, 39.)

*Second*, the Appellees retreat from that extreme approach, but only slightly. In their view, the "accepted practice of allowing counsel to apportion fees amongst themselves" is enough to carry the day, simply because the district court said it was "retaining jurisdiction" over fee disputes. (Appellees' Br. at 29–30 (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 533 n. 15).) But here, the district court didn't use its ongoing jurisdiction to ensure a reasonable fee allocation. It never questioned the Appellees' assertion that "we, as appointed class counsel, are best suited to apportion fees to those firms who perform work that benefited the class" and simply "allow[ed] [them] to continue . . . in that role." (Fairness Hearing Tr., R. 553, PageID 14523.) The court did not dig into the numbers, even after Mr. Morgan stated, "it [was] unclear … how the class counsel calculated the allocation for Morgan & Morgan or for any other firm." (Mot. to Enjoin Attorney's Fee Award, R. 664-1, PageID 46335.) What good is "retaining jurisdiction" without digging into the "granularity" of the Appellees' fee allocation? This "trust, and do not verify" approach is synonymous with abdication, no matter how many times the Appellees

say otherwise. *See High Sulfur*, 517 F.3d at 228. The Court should not allow the Appellees to flip yet another well-known saying on its head.

*Third*, the Appellees declare that no firm aside from Morgan & Morgan objected, so that must mean there were no problems with their fee allocations. (Appellees' Br. at 44.) But once again, the absence or presence of objections under "retained jurisdiction" has nothing to do with whether the court properly exercised its duty to oversee the attorney's fees. Regardless of whether there are objections, courts must "carefully scrutinize whether [class counsel's] fiduciary obligations have been met" and "cannot rely on the adversarial process" to facilitate that scrutiny. *Dry Max Pampers*, 724 F.3d at 718. At the very least, the Appellees should have been required to show the presence or absence of "preferential treatment" in their allocation methodology. *Id.*; (Appellees' Br. at 18.). Though "[m]ost class counsel are honorable," the Appellees should not have been permitted to allocate and distribute $162 million from the common fund with their self-interested "judgment" as the only safeguard. *Dry Max Pampers*, 724 F.3d at 718; (*see* Order on Attorney's Fees, R. 556, PageID 14578.)

The Appellees were never even required to say how much they paid themselves. Search the record for documentation of the Appellees' share of the fee award, or the compensation of any other firm for that matter. That information is

nowhere to be found.[1] The Appellees were allowed to make their allocations on the honor system and entirely outside the public eye. *See High Sulfur*, 517 F.3d at 230 ("[F]ee disputes, like other litigation with millions at stake, ought to be litigated openly."). This process hardly reflects careful scrutiny; it was complete deference to "counsel [who] have inherent conflicts." *Id.* at 235 (quoting *In re Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J., concurring)). With that context, the number of objections is of no relevance. The Appellees should not have been permitted to administer the fee award with no practical accountability to their co-counsel, the settlement class, or the district court—even if Mr. Morgan was the only one willing to point out that problem.

*Finally*, the Appellees go on to attack Mr. Morgan for not "rais[ing] a specific concern with [Morgan & Morgan's] allocated share." (Appellees' Br. at 41.) But how was Mr. Morgan supposed to do that without any explanation for the hours and

---

[1] The Appellees say that "it does not appear that Morgan ensured that the transcript [of the November 1, 2024 telephonic conference regarding his Motion to Enjoin the Attorney's Fee Award] was part of the record." (Appellees' Br. at 41 n. 10.) That's not true at all. The transcript was ordered (Appellate R. 8) and shortly thereafter, the district court lifted restrictions on its use (R. 729). Then, the court reporter acknowledged the transcript was "[a]lready on file in the district court." (Appellate R. 12.) The transcript is part of the record and, on top of that, the Appellees have always had access to it. This Court may access the as-filed transcript through the Clerk of Court for the Northern District of Ohio, as it has in similar situations. *E.g.*, *United States v. Adams*, 124 F.4th 432, 436 n. 1 (6th Cir. 2024). To obviate any confusion, Morgan & Morgan will move the district court to assign a docket number to the transcript.

multipliers the Appellees used in their allocation decisions? To distract from this indisputable fact, the Appellees accuse Morgan & Morgan of "engag[ing] in rank (and insulting) speculation," casting aspersions against them, and "hyperbole." (Appellees' Br. at 18, 29, 39, 44.) The Court should not allow this heated rhetoric to distract from the issue at hand. Mr. Morgan had to speculate about side deals and slush funds because the Appellees never explained their allocation methodology—even after his concerns landed before district court. By that time, however, the Appellees had already distributed the fee award to their co-counsel firms. The plea for real fee allocation scrutiny does not reflect a lack of diligence on Mr. Morgan's part. It reflects the Appellees' lack of transparency. So how did the Appellees manage to distribute the fee award without revealing the details of their allocation methodology? The quick-pay provision.

## II. The Quick-Pay Provision Operationalized the District Court's "Trust, and Don't Verify" Misstep.

In a class settlement scenario, paying the lawyers before their clients is always a dubious proposition. Indeed, "the entire purpose of the lawsuit is to compensate the class—not the lawyers." *Hart v. BHH, LLC*, 334 F.R.D. 74, 77 (S.D.N.Y. 2020). Even worse is what happened here: advancing payment to a select group of lawyers without making them connect fee distributions to case performance in an understandable manner. *See High Sulfur*, 517 F.3d at 230 ("If the attorneys are inclined to squabble over the generous fee award, they are well positioned to

comment—publicly—on each other's relative contribution to the litigation."). At its core, quick-pay is designed to tamp down on reasonable dissent, complicate judicial oversight and appeals, and rush to the end of class action settlements. Quick-pay messes should not be tolerated, especially because lawyers can just wait on compensation until objector appeals are resolved—just like their clients. With the Appellees' unnecessarily opaque fee allocations in mind, Morgan & Morgan asks this Court to reject an "I get paid, you wait" scheme in favor of the well-known "I don't get paid unless you get paid" approach.

### A. Morgan & Morgan has Standing to Challenge The Quick-Pay Provision—the Distribution Issue—Alongside the Allocation Issue.

Perhaps recognizing the unseemliness of the quick-pay arrangement, the Appellees try to steer away from the substance of that issue altogether by claiming that Morgan & Morgan lacks appellate standing. The Court should reject this ploy because Morgan & Morgan is "plainly aggrieved" by the district court's attorney's fee orders. *In re Nat'l Prescription Opiate Litig.*, 976 F.3d 664, 670 (6th Cir. 2020). The flawed fee distribution process short-circuited judicial review of the Appellees' allocation methodology, likely causing financial harm to Morgan & Morgan—if not the settlement class.

The first step in Appellees' ploy is an attempt to sever scrutiny of the quick-pay provision (the distribution issue) from the rest of the attorney's fee analysis (the allocation issue). But those issues are inextricably intertwined. The interests of each

and every one of the plaintiffs' firms—including Morgan & Morgan—are tied up in both the timing and amount of the fee payments from the common fund. For proof, look no further than the order that generated this appeal. (Order Denying Morgan & Morgan's Fee Mot., R. 689, PageID 51086, 51088.) Front and center are the distribution issue ("when should we get paid?") and the allocation issue ("how much do we get paid?"). (*Id.*) Quite simply, it makes no sense to say that Morgan & Morgan may challenge one key aspect of the district court's attorney's fee decision, but not another. Morgan & Morgan may challenge the propriety of quick-pay as part-and-parcel to the allocation issue.

More to that point, the Appellees argue that the district court had "jurisdiction over the implementation of the [Settlement]" and retained "jurisdiction over the Settlement and all orders related to it (including the Attorneys' Fee Order)." (Appellees' Br. at 31, 40 (quotation omitted).) Tellingly, the Appellees do not argue that Morgan & Morgan lacks standing to challenge the substance of their allocation decisions—because they obviously cannot. (*See* Appellees Br. Part II at Pages 29–45 (arguing the allocation issue without mention of standing).) So, on one hand, the Appellees want to reach the merits on the allocation issue to maintain the illusion that the district court properly oversaw the common fund. But on the other, the Appellees argue that Morgan & Morgan cannot have anything to say about the

timing of those fee distributions. This Court should address the attorney's fee issues in a comprehensive manner.

The second problem with the Appellees' standing argument is that it falls flat, even when quick-pay is isolated from the allocation issue. It is plainly incorrect to say that Morgan & Morgan could only "benefit from the quick-pay distribution." (Appellees' Br. at 21 (emphasis removed)). Wrong payment is not a benefit to anyone, even if it is quick. As already explained, Morgan & Morgan would be entitled to a larger fee allocation if its attorneys "work[ed] for a regular hourly rate, while [the Appellees] rewarded themselves with a premium multiplier on their own hours." (Appellant's Br. at 44.) And quick-pay underpayment would deprive Morgan & Morgan of the time value of that misallocated money. (*See* Appellees' Br. at 21.) Speaking hypothetically, Morgan & Morgan would also be harmed if it had accepted quick-pay *overpayment*. In that instance, it would have to pay back an interest-bearing share of the misallocated money within 14 days. (Settlement Agreement, R. 452-2, PageID 6028–29.) Such an unexpected expense might require Morgan & Morgan to liquidate assets or burden its investments in other cases. So the claim that Morgan & Morgan could only "benefit from the quick-pay distribution" only works if one also assumes that their allocation methodology was unimpeachable. (Appellees' Br. at 21 (emphasis removed).) This record does not allow for such a conclusion.

The third flaw in the Appellees' standing argument is that it conflates appellate standing with Article III standing. (*See* Appellees' Br. at 20.)[2] As this Court has made clear, "[a] party has appellate standing—which is distinct from Article III standing—when that party is 'aggrieved by a judgment or order of a district court.'" *In re Nat'l Prescription Opiate Litig.*, 976 F.3d at 670 (quoting *Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 333 (1980)); *see also United States v. Perry*, 360 F.3d 519, 526 (6th Cir. 2004) ("Article III affords standing to non-parties for purposes of appeal in some circumstances"). The relevant inquiry is whether the district court's judgment on attorney's fees—with quick-pay as an essential component—imposes "some detriment" on Morgan & Morgan. *Pedreira v. Sunrise Children's Servs., Inc.*, 802 F.3d 865, 869 (6th Cir. 2015) (quoting *Vanguards of Cleveland v. City of Cleveland*, 753 F.2d 479, 484 (6th Cir. 1984)). That detriment doesn't necessarily have to include a certain financial loss; all that is required is that the substantive provisions of the district court's order unlawfully infringe upon Morgan & Morgan's interests. *Vanguards of Cleveland*, 753 F.2d at 484.

---

[2] The Appellees cite *In re Capital Contracting* to support their appellate standing argument, but that case does not apply here. *In re Capital Contracting* involved an appeal from a bankruptcy court's order to a district court, so it is procedurally distinguishable from this appeal. 924 F.3d 890, 893, 897 (6th Cir. 2019). *In re Capital Contracting* is also factually distinguishable because the appealing party in that case had no hope of obtaining "one cent more," whereas Morgan & Morgan has a real financial interest at stake. *Id.* at 897.

Morgan & Morgan is "plainly aggrieved" by the district court's decision on the distribution issue and its endorsement of quick-pay. *In re Nat'l Prescription Opiate Litig.*, 976 F.3d at 670. Like every one of its co-counsel firms, it has an interest in receiving fair compensation for its work on behalf of the class with proper judicial oversight. More specifically, Morgan & Morgan has appellate standing for its quick-pay challenge because that provision has caused a specific detriment: it makes the attorney's fee order effectively unreviewable. (Mot. to Reconsider & Enjoin Order on Attorney's Fees, R. 664-1, PageID 46336–37); *c.f. U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 444 F.3d 462, 472 (6th Cir. 2006) (discussing the underpinnings of the collateral order doctrine, which is designed to prevent an important issue from evading appellate review).

As discussed, the district court did not require the Appellees to detail their fee allocation method in the record. If and when the Appellees are ordered to show the work behind their fee methodology, it may reveal that Morgan & Morgan's initial allocation was too small. But by then, the privileged firms will have already spent the misallocated funds—and some of that money may be lost forever. In that case, Morgan & Morgan's successful challenge to the fee award maladministration will have been for nothing, all because of quick-pay. As this Court has made clear, "there is perhaps no better example of a party aggrieved by a district court's judgment than a party" stuck with its financial ramifications. *Gillispie v. Miami Twp., et al.*, Nos.

17

23-3999, 23-4000, 23-4001, 2025 WL 1276900, at *6 (6th Cir. May 2, 2025). Put differently, quick-pay will have destroyed Morgan & Morgan's appellate recourse.

As much as the Appellees would like to avoid the merits of the quick-pay issue, this Court should reject their ill-conceived appellate standing arguments. Rule 23 is supposed to ensure that Morgan & Morgan gets paid the right amount of money at the appropriate time. But quick-pay interfered with that objective, and intentionally so. Morgan & Morgan has appellate standing.

## B. Morgan & Morgan Timely and Appropriately Raised the Quick-Pay Issue with the District Court.

The Appellees present the quick-pay issue as if its problems were apparent before the district court approved the settlement and the accompanying motion for attorney's fees. (Appellees' Br. at 22 (arguing that Morgan & Morgan should have objected by July 1, 2024, the objection deadline set by the preliminary settlement approval order).) That is not a fair characterization of how the issue developed.

To begin, the Appellees kept Mr. Morgan believing he would be included in the allocation and distribution of the fee award—as he should have been—until after the July 1, 2024 objection deadline and the September 25, 2024 fairness hearing. Nothing in the Appellees' brief changes that reality. They even draw attention to Mr. Morgan's declaration in support of their motion for attorney's fees—a declaration that they used to substantiate the request for a $162 million award. (Appellees' Br. at 10 (citing Morgan. Decl., R. 518-9, PageID 11183–85).) That happened because

the Appellees recognized, at the time at least, that Mr. Morgan understood *all* the work it took to secure the $600 million settlement. The knowledge Mr. Morgan derived from his leadership role didn't just evaporate when it came time to divide the fee award. And it is not "sour grapes" for Mr. Morgan to insist that the knowledge reflected in his declaration should have been applied when dividing the common fund money, particularly if it was good enough to help ask for $162 million. (*See* Appellees' Br. at 1.) The Appellees cannot be allowed to use Mr. Morgan as a pawn to obtain a massive fee award, and then later pretend that he should not have anything to say about its allocation and distribution.

More importantly, the quick-pay provision made it functionally impossible for the plaintiffs' firms to bring their allocation concerns before the district court. While it is certainly no secret that "counsel would like to be paid sooner rather than later," quick-pay provisions cannot be used to short circuit "a searching judicial inquiry." *Hart v. BHH, LLC*, 334 F.R.D. at 77, 78; *but see* (Appellees' Br. at 28 (implying that "operat[ing] under the cloud of a repayment clause" incentivizes lawyers as much as holding their compensation until after objector appeals are resolved).) No such inquiry occurred here because the district court rubber stamped a fee allocation that was decided before Morgan & Morgan even had a chance to object.

On that note, it is fallacious to proclaim that Mr. Morgan's signing the settlement agreement, made it "invited error" for him to challenge an abuse of the quick-pay provision. (Appellees' Br. at 23.) At the time Mr. Morgan signed the settlement agreement, there was never any hint that the Appellees would force Morgan & Morgan to accept an unexplained allocation without a way to challenge excluded hours, multipliers, or the calculation itself. (Mot. to Enjoin Attorney's Fee Award, R. 664-1, PageID 46335.) So would Morgan & Morgan have any recourse if its allocation was only $1? The answer is certainly yes.

The Appellees never explain why this situation is any different. Rather than addressing the unchecked discretion afforded by their own quick-pay provision, the Appellees deride Morgan & Morgan's concerns as based on "fiction." (Appellees' Br. at 34.) Yet they still have to admit, "the district court certainly authorized [them] 'to distribute the fees'" just two days after the fairness hearing, before any allocation issue ever came up. (*Id.*; *see also* Fairness Hearing Tr., R. 553, PageID 14423–14541 (documenting that the only attorney's fee issues discussed at the fairness hearing were overall size of the fee award and the complete exclusion of attorneys who did nothing to advance the interests of the settlement class).) Therein lies the problem. There is simply no denying that the Appellees used quick-pay to distribute the fee award before Morgan & Morgan had a chance to question their allocation methodology.

Further, the Appellees' quick-pay argument collapses under its own contradictions. A court cannot provide "adequate protection against any potential abuse" by "retaining jurisdiction" (Appellees' Br. at 31) if an aggrieved party is left with no way to complain about its allocation upon distribution of the fee award. But that is exactly what the Appellees would have the Court decide. According to the Appellees, Mr. Morgan should have objected to their quick-pay abuse by July 1, 2024, months before they approached him with their "take-it-or-leave-it" allocation. (*Id.* at 22.) Without time travel or a crystal ball, this makes no sense. And the Appellees' view on "retaining jurisdiction" is completely irrelevant to the court's obligations to place the settlement class on equal footing with their legal representatives and to ensure that all counsel are fairly compensated for their work. The district court had a job to do, and it did not do it, regardless of whether its orders purported to "retain[] jurisdiction over the … fee allocation process to protect against any potential abuse." (Appellant Br. at 40.)

Against that backdrop, the Appellees' attempt to distinguish *In re High Sulfur Content Gasoline Products Liability Litigation* deserves no credit. (*See* Appellees' Br. at 37–39 (citing 517 F.3d 220 (5th Cir. 2008)).) As the Appellees point out, a firm in that case "objected after it received less than one-third of the amount it requested in fees." (*Id.* at 37–38 (citing *High Sulfur*, 517 F.3d at 225–226). So *High*

*Sulfur* illustrates that a law firm may timely object after it receives notice of a deficient and unexplained fee allocation.

Based on the circumstances described in *High Sulfur*, Morgan & Morgan's quick-pay objection was timely presented. Mr. Morgan had no reason to suspect that anything was amiss until October 7, 2024, when the Appellees communicated "[w]e have finalized the allocations and need wire instructions." (Mot. to Enjoin Attorney's Fee Award, R. 664-1, PageID 46335.) Until that point, the Appellees always relied on Mr. Morgan in making fee-related decisions. But again, they shifted course when it came time to distribute the money. This time, the Appellees presented Morgan & Morgan with an unexplained "take-it-or-leave it" choice. In response, Mr. Morgan took action as soon as he understood that the Appellees were distributing the fee award in a black box. After trying in vain to get answers from the Appellees, he brought the issue before the district court on October 25, 2024—18 days after the Appellees' surprise request for wire instructions. Far from a "lack of diligence" (Appellees' Br. at 34), Mr. Morgan's actions show that Morgan & Morgan "timely noted its objections to the Appellees' fee distribution plan as soon as it became clear that their allocation decisions could harm the settlement class and their co-counsel." (Appellant's Br. at 14.)

The Appellees' use of quick-pay also fully explains the degree of detail in Mr. Morgan's objection. (*See* R. 664-1, PageID 46332–45.) Again, the Appellees got the

money, decided on a number for each firm, and never "showed their work." (Mot. to Enjoin Attorney's Fee Award, R. 664-1, PageID 46335 ("Even after talking with class counsel, it is unclear to Attorney Morgan how the class counsel calculated the allocation for Morgan & Morgan or for any other firm.").) Had Mr. Morgan been equipped with the Appellees' allocation methodology, he would have been able to present detailed objections to the district court. But instead, the Appellees used quick-pay to keep the specifics of their fee allocations out of the record, with no substantive review from the district court.

Contrary to the Appellees' assertions, they never provided enough information for Morgan & Morgan and the district court to "discern how attorney work was valued." (Appellees' Br. at 38.) After all, how can this Court be sure that Morgan & Morgan was "given the same [rates and] multipliers as [the Appellees]" without knowing how much the Appellees paid themselves? (Appellees' Br. at 43.) This question remains unanswered, even if Morgan & Morgan went back into the "information about their approved hours and expenses" and reverse-engineered the allocation methodology for its own payout. The Appellees also say "that the law firm Zoll & Kranz LLC was engaged to keep and audit time and expense records." (*Id.* at 38.) Yet these audit records do not appear in the record and the district court did not consider them. This secretive hardball should not be condoned, particularly when such a large sum of money is drawn out of a common fund.

This case has all the hallmarks of an unlawful quick-pay provision. The court adopted the Appellees' proposed order without substantive modifications, a gateway to "cookie-cutter jurisprudence." *Hart*, 334 F.R.D. at 78. On appeal, the Appellees also use "stock" justifications for quick-pay because the district court record does not prove that they afforded Morgan & Morgan the same hourly rates and multipliers. *See id.* at 78. Further, the court accepted the quick-pay provision without using "the adversarial process" to draw out the Appellees' allocation and distribution plan. *See id.* at 77. For as much as the Appellees accuse Morgan & Morgan of relying on speculation, this Court cannot be sure that the attorneys' fees were divided fairly. *High Sulfur*, 517 F.3d at 227.

The Appellees also mischaracterize Morgan & Morgan's quick-pay objection as based on "unfounded speculation." (Appellees' Br. at 16.) Morgan & Morgan's opposition to quick-pay is premised on two problems that this Court has already decided to root out: (1) class attorneys should not "generate fees for themselves without any effective monitoring"; and (2) class attorneys should not get "preferential treatment" over their clients. *Dry Max Pampers*, 724 F.3d at 718. Quick-pay provisions, including this one, make it much harder for courts to oversee allocations and distributions to attorneys from a common fund. Plus, eliminating or curtailing quick-pay arrangements would prevent lawyers from taking from the common fund before class members even know their compensation. Morgan &

Morgan's theory of the case is in keeping with the spirit of Rule 23. It provides appropriate safeguards with no downsides—except for attorneys who want to pay themselves before their clients get relief.

On the other hand, the Appellees' preference for quick-pay thwarts effective monitoring of the lawyers' piece of the pie. It also raises the possibility that lawyers will lose common fund money that belongs to class members, even if the Appellees think it is "exceedingly unlikely" that the objector appeals will be successful in this particular case. (Appellees' Br. at 27.) If anything, the inability to project the outcome of objector appeals weighs against routine quick-pay approvals. Either way, the Appellees' "I get paid, you wait" scheme resembles the sort of "preferential treatment" this Court has overruled in the past. *Dry Max Pampers*, 724 F.3d 719, 723; *see also Hart*, 334 F.R.D. at 77–78 (concluding that quick-pay advantages attorneys over their clients).

It would also be unrealistic to treat the presence of a repayment clause as fully insuring the settlement class against the risk of law firms squandering some of the common fund money they received via quick-pay. If the objector appeals succeed, dozens of different law firms would be forced to come up with an interest-bearing $162 million, a massive sum by any objective evaluation. Yet the Appellees say this should be of no concern to the settlement class just because the law firms promised to repay. If law firms were that much of a financial sure thing, banks would give

them low interest loans without a credit check. In the real world, however, law firms have just as much credit risk as almost any other business. The repayment clause amounts to little more than words on a page when compared to the class's interest in the common fund.

After taking into account all the practical problems with the Appellees' use of quick-pay, the analysis in *Pelzer v. Vassalle* is far from "unimpeachable" in every class action settlement situation. (Appellees Br. at 25 (discussing 655 F. App'x 352 (6th Cir. 2016).) As the Appellees concede, *Pelzer* is an unpublished decision and therefore does not provide blanket authorization of quick-pay provisions. (Appellees' Br. at 25.) But more than that, the Appellees fail to offer a compelling justification for this "I get paid, you wait" arrangement. All told, the district court fast-tracked a "trust, and don't verify" attorney compensation model using a mix of proposed orders and cursory dismissal of Mr. Morgan's objections.

## CONCLUSION

This Court should require proper supervision of the allocation and distribution of attorney's fees. The Appellees cannot usurp the judiciary's fee oversight responsibilities. Morgan & Morgan respectfully requests an Order reversing the district court's quick-pay decision, directing the plaintiffs' firms to refund their fee allocations, and requiring the district court to oversee new fee allocations upon disposal of the objectors' appeals.

Respectfully submitted,

*/s/ Aaron M. Herzig*
Aaron M. Herzig
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Phone: (513) 381-2838
aherzig@taftlaw.com

David C. Roper
Taft Stettinius & Hollister LLP
41 S High Street, Suite 1800
Columbus, OH 43215-4213
Phone: (614) 221-4000
droper@taftlaw.com

*Counsel for Appellant Interested-Party T. Michael Morgan and Morgan & Morgan*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g), I certify that this brief:

(1) complies with the type-volume limitation of Rule 32(a)(7) because it contains 6,482 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f) and

(2) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word and is typeset in Times New Roman in font size 14.

Dated: June 6, 2025

*/s/ Aaron M. Herzig*

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 6, 2025, I electronically filed the foregoing

brief with the Clerk of the Court using the appellate CM/ECF system, which

served copies of the brief on all ECF-registered counsel.

Dated: June 6, 2025

*/s/ Aaron M. Herzig*